### WILLIAM UNA et al.

*v.*

### DANIEL DODD et al.

The court of chancery may, in proceedings for contempt, order the evidence of witnesses resident in foreign jurisdictions taken by commission or otherwise, and use the evidence so taken on the hearing.

On application for leave to take the testimony of non-resident witnesses.

*Mr. Frederic W. Stevens* and *Mr. Samuel Kalisch*, for application.

*Mr. Thomas N. McCarter*, contra.

VAN FLEET, V. C.

The managers of the Newark Savings Institution are before the court on a charge of contempt. They are charged with having invested the funds under their charge contrary to the directions of an order of the chancellor. They have answered, denying many of the facts charged against them. An issue of fact is thus raised which can only be tried by evidence. Two witnesses, whose evidence the prosecutors desire, reside in the state of New York. It is satisfactorily shown that these witnesses refuse to come to this state to give evidence, and also that their evidence is material. In this posture of affairs the prosecutors ask for leave to take the evidence of these witnesses, in the state where they reside, and to that end ask for the appointment of a com-

missioner, under the thirty-eighth section of the act concerning evidence (*Rev. p. 384*), before whom their evidence may be taken. The managers oppose this application, insisting that the statute was intended to be applied exclusively to civil proceedings, and that this proceeding is not of that character, but is criminal in its nature, being, in fact, a charge of a criminal offence.

That the language of the statute is sufficiently comprehensive to embrace this proceeding, I think there can be no doubt. It declares that its provisions shall apply to any proceeding in the court of chancery wherein the testimony of witnesses may be required as the basis of judicial action. *Rev. p. 389 § 39.* This proceeding is unquestionably of that kind. From a very early day it has been held by courts of equity that if the person accused denies the contempt, the prosecutor may, as of course, examine witnesses to prove it. *1 Newland's Ch. Pr. 392; Magennis v. Parkhurst, 3 Gr. Ch. 433.* The statute is a highly salutary one, and was obviously designed to aid in giving effect to that great maxim of justice which declares that in legal controversies both sides have a right, before judgment, to be fully heard, upon matters of fact, by their evidence. It was intended to advance justice by facilitating the investigation of truth by the aid of testimony, which, from the absence of witnesses out of the jurisdiction of the state, could not otherwise be procured. It is highly remedial in its character, and the courts are, therefore, bound to so construe and apply it as to give effect to its beneficial purposes. *Hildreth v. Overseer of the Poor, 1 Gr. 5; Moran v. Green, 1 Zab. 562.*

Such has been the undeviating course of the courts of this state. A charge of bastardy always, necessarily, involves the charge of a crime. The whole proceeding is according to the course of the criminal courts. The first process, formerly, was a warrant for the arrest of the putative father. If arrested, he was required to give bail for his appearance to answer the charge or to go to prison. If an order of affiliation and maintenance was made against him, he was required to give security for its performance, or to indemnify the township, or to submit to imprisonment. Though not for the punishment of crime, yet the

Una *v.* Dodd.

proceeding was so nearly akin to a criminal accusation, and the
charge involved so much that was necessarily criminal in its
character, that, contrary to the general rule prevailing in ordi-
nary civil actions, it was held that the accused should have the
right to put his character in evidence against the truth of the
charge. *Dally* v. *Overseers of Woodbridge, 1 Zab. 491; Hawk-
ins* v. *State, 1 Zab. 630.* And yet such proceedings have been
held to be so far suits of a civil nature, that the putative father
was entitled to a commission to examine a witness residing in
another jurisdiction. *Hildreth* v. *Overseers of the Poor, supra.*

Very eminent judges have, it must be admitted, spoken of
contempts of court as criminal offences. In *Ex parte Kearney,
7 Wheat. 38,* a person who had been committed by the circuit
court of the District of Columbia for contempt, in refusing to
answer a question put to him as a witness on the trial of an in-
dictment in that court, applied to the supreme court of the
United States for a writ of *habeas corpus* to test the validity of
his commitment. The writ was denied. Judge Story, who drew
up the opinion of the court, put the denial of the writ on the
ground that inasmuch as the supreme court could not entertain a
writ of error to revise the judgment of the circuit court in any
case where a party had been convicted of a crime, it should not
attempt to do indirectly what it was clear it had no right to do
directly. And Mr. Justice Swayne, in *New Orleans* v. *Steam-
ship Co., 20 Wall. 387,* said that a contempt of court is a spe-
cific criminal offence. Judge Black had previously defined it
in precisely similar language in *Passmore Williamson's Case, 26
Pa. St. 9;* and Judge McCrary, in *Vanzandt* v. *Argentine Mining
Co., 2 McCrary 642,* recently said : "A proceeding for contempt,
where its object is simply to vindicate the authority and dignity
of the court, is, in its nature, a criminal proceeding, and is to be
governed by the strict rules of construction which prevail in
criminal cases." There are cases also which ascribe two distinct
functions or offices to such proceedings. It is said that where the
purpose is simply to vindicate the power and dignity of the court,
there the proceeding is criminal in its character, but where its
object is to enforce an order or decree for the benefit of a party

to the suit, there the proceeding is civil and remedial. *Hendryk* v. *Fitzpatrick, 19 Fed. Rep. 810; In re M'Williams, 1 Sch. & Lef. 169; Rex* v. *Myers, 1 Term Rep. 265; Rex* v. *Edwards, 9 Barn. & C. 652; People* v. *Brown, 6 Cow. 41.*

But, in my opinion, it is quite unimportant how such proceedings have been defined or classified. The more important question is, Has the court jurisdiction? If it has, it seems to me that nothing can be clearer than that the court may, in the exercise of an authority necessarily inherent in its jurisdiction, proceed in its own way, and according to its established practice, to ascertain the truth of the matters in dispute. If the matter at issue is the proper subject of equity cognizance, it would seem to be indisputable that the court, in trying it, has not only the right, but is bound to use all the means at its command for the discovery of the truth. A failure in this respect would be a denial of the process of the law to a party entitled to it. The jurisdiction of the court in such matters is not questioned, and cannot be. The power of the court to punish contempts is as incontestable as the fact that the court exists. The court of chancery can exercise jurisdiction in civil matters only. It has no criminal jurisdiction whatever. If it were to attempt to take jurisdiction of the most trifling offence against the criminal law, and proceed to try and condemn the offender, its act would be an act of simple usurpation, and its judgment would be utterly null and void. A contempt against the court of chancery may, it is true, be something more than a mere contempt. The person guilty of a contumacious act against this court may, in contemning its authority, have also committed a violation of the criminal law. In such case this court may deal with him for his contempt, but it has no power to punish him for his crime, and if it should attempt to do so, its action would be *coram non judice.*

The power invoked in this matter is one that the court of chancery of England has exercised from a very early day. It seems to have constituted part of its original jurisdiction, and to have been borrowed from the civil law. *1 Dan. Ch. Pr. 932.* Professor Greenleaf seems to regard it as a power inherent in all courts of justice, for he says that by the law of nations, courts of

justice of different countries are bound, mutually, to aid and assist each other in the furtherance of justice, and hence it has become the practice, when the testimony of a foreign witness is necessary for the court before which the action is pending, and in which the evidence of the foreign witness is needed, to send to the court within whose jurisdiction the witness resides, a commission for his examination. He further says that while the common law courts of England have never asserted this power, in a direct manner, the court of chancery has always freely exercised it. *1 Greenl. Ev.* § *320.* Mr. Gresley, in contrasting the methods of the two jurisdictions in taking evidence, says that while the common law courts are without the means of procuring the evidence of a witness who cannot appear before them, the court of chancery may examine a witness residing in any part of the world. *Gres. Eq. Ev. 62, 116, 126.* And he also says that ever since the passage of the statute *1 Wm. IV. c. 22*, giving all the courts of Westminster Hall authority to take the evidence of witnesses residing in other jurisdictions, the court of chancery finds it more convenient to follow its ancient practice than to proceed under the statute. *Id. 126.*

Prior to the statute of *1 Wm. IV. c. 22*, the court of chancery of England was in the constant habit of using its power to take the evidence of witnesses residing in foreign jurisdictions in behalf of litigants in the common law courts. Tindal, C. J., in *Bridges v. Fisher, 1 Bing. N. C. 510, 512,* said : " Every one knows that before the passage of the statute *1 Wm. IV. c. 22*, a party who wanted the testimony of a witness abroad, filed his bill in chancery for a commission to examine him, and the cause was hung up till the suit in chancery was at an end." The grounds upon which the court of chancery proceeded, in giving litigants in the common law courts the aid of its process, were declared by the house of lords in *Nicol* v. *Verelst, 7 Bro. P. C. 245.* Lord Eldon repeated them in pronouncing the judgment of the same court in *Macaulay* v. *Shackell, 1 Bligh (N. S.) 96.* He there said : " Where witnesses reside abroad and cannot or will not personally attend in England, the power of the courts of law is at an end, as they have no means of examining witnesses abroad ; but the court of

Una *v.* Dodd.

chancery having authority to issue commissions, under the great seal, for various purposes, and amongst others for examining witnesses in causes in that court, the suitors, defendants at law, have availed themselves of the power of the court of chancery to come in and supply the failure of justice by preferring their bills there, containing a state of their case and of the proceedings at law, with the defendants' misfortune that their witnesses being resident abroad, and not compellable to appear at the trial, they cannot have the benefit of their testimony, and therefore praying that the court will relieve them against this accident, and grant them a commission for the examination of their witnesses, to the end that their depositions may be read at law; and as it would be nugatory to try the cause without evidence, praying also that the plaintiff at law may be restrained, by injunction, from proceeding, in the meantime, till the return of the commission. Both the court of chancery and of exchequer, as courts of equity, have always entertained these bills as belonging to one of their great sources of jurisdiction—the relief against such accidents as are beyond the power of the courts of law to aid." Chancery may give this aid to either party to a suit at law. *Devis* v. *Turnbull, 6 Madd. 232.*

The bill in *Macaulay* v. *Shackell* was filed to restrain an action at law until the evidence of certain witness residing in the West Indies and in Africa could be obtained under a commission from chancery. The right of the complainant to a commission in that case was resisted on the same ground on which resistance is made here, namely, that the matter to be investigated involved an indictable offence, the action at law there being for a libel, which might also have been made the basis of an indictment. The court, however, held that the objection was both against precedent and inconsistent with reason. In an anonymous case reported in *Mosely 312*, it is said that by the standing rule of the court, if the contemnor, being examined on interrogatories, denies the contempt, the prosecutor may take out a commission to prove it. The same course of practice is vouched for by Newland. *Newl. Ch. Pr. 392.*

These authorities render it entirely clear, in my judgment, that

30

this court, independent of any authority conferred by statute, has power, in every cause and proceeding pending before it, where it is necessary in order to ascertain the truth of the matters in dispute, to have the evidence of witnesses residing in other jurisdictions, to take their evidence. The matter now in dispute is one of which this court has complete and exclusive jurisdiction. It can be tried by no other tribunal. It must be tried here, in conformity to the practice and by the methods of this court, or not at all. The managers are not under indictment nor on trial for a crime; they are not, in this matter, entitled to a trial by jury, nor to be confronted with the witnesses against them. They have a right that the court shall, according to its accustomed methods, ascertain whether the charges are true or not before pronouncing judgment, but not that the court shall depart from its ordinary course of practice. The court is charged with the duty of ascertaining whether the matters charged against the managers are true or not, and in the performance of this duty it would commit a grave error, besides might possibly exclude the truth, if it did not see to it that both parties were given the full use of all the means at its command for the discovery and manifestation of the truth.

The order asked will be advised.