## STATE OF INDIANA *v.* SHUMAKER ET AL.

[No. 25,147. Filed August 5, 1927. Motion for new trial overruled August 18, 1927. Supplemental opinion filed and rehearing denied July 20, 1928.]

624

*Arthur L. Gilliom,* Attorney-General, *William Thompson* and *Solon J. Carter,* for the State.

*Bingham & Bingham* and *Ethan A. Miles,* for respondents.

*Moses B. Lairy, Fred C. Gause, George O. Dix, Dan W. Simms, Evan B. Stotsenburg* and *C. C. Shirley, Amici Curiae.*

MYERS, J.—The Attorney-General of Indiana, by an amended verified information filed in this court, in substance, alleged that the respondents, Edward S. Shumaker, superintendent and directing head of an association known as the "Anti-Saloon League of Indiana," Ethan A. Miles, an attorney and counsel for the league, and Jesse E. Martin, a trustee and attorney of the league, are guilty of an indirect contempt of this court, in that, Shumaker, with whom Miles and Martin collaborated, prepared, printed, published, circulated and distributed to the clergy and members of the Woman's Christian Temperance organization throughout the state a pamphlet, in which was incorporated misleading, false and defamatory statements of and concerning the Supreme Court, its judges, and decisions in respect to violations of the liquor laws of the state, a copy of which pamphlet, including said false and defamatory statements and matters, was, by Shumaker, caused to be printed in the Indiana edition of the "American Issue" of February 6, 1926, and circulated among its readers and subscribers. The entire pamphlet, as reprinted in the "American Issue," is exhibited with the information, and purports to be an annual report of the superintendent of the Indiana Anti-Saloon League, wherein, after asserting that the Supreme Court of the United States in 1907 changed its rule theretofore existing admitting evidence obtained by an invalid search warrant in the trial of an accused person, and for so doing has been very severely criticised by a text writer, it falsely and contemptuously stated that this court has *"held that a defective search*

*warrant should operate to let a guilty person go free"; that "this court in the Callender case from Elkhart, and more particularly in the Flum case from Beech Grove in Marion County, and these reenforced by a number of later decisions, has held. that no matter how guilty a person may be of violating the prohibition law, even though he might have as many as three stills in his home and be engaged in manufacturing a 'white mule' that is poisonous and deadly in its effects—should there be any mistake in the search warrant—such a person must be turned free. We think that such rulings, coupled with the splitting of judicial hairs in many cases coming before our supreme court whereby substantial justice has been defeated repeatedly, has been to a great degree responsible for the great increase in the appeals of criminal cases to our state's highest judiciary." In 1918, twenty-four criminal cases were appealed to the State Supreme Court, while in 1925 there were 212.* (Our italics.)

After asserting that a majority of the court is at least liberal in its sentiments, the report states: "One of its members is said to be bitterly hostile to prohibition, and, if he had it in his power, would wipe all prohibition laws from the statutes." Under the heading, LIQUOR ASSAULT ON COURTS, the report states that: "We well remember how the late Colonel Eli F. Ritter, pioneer attorney for the temperance forces in Indiana, used to say to us that when the liquor interests could no longer control the legislative or executive branches of our government, they would then turn their attention to our courts and seek to control them. *I think. there is no doubt that this is true today in a bigger sense than ever before, and that the law-abiding people of our state will have to strive for the nomination and election of judges of such high judicial equipment and such a sense of honor and loyalty to the Constitution and the laws enacted thereunder that they will give judicial decisions carrying out in full,*

*and effective manner both the letter and the spirit of our Constitution and laws enacted thereunder.* (Our italics.) To those who would urge that we are attacking the courts, and encouraging disrespect for the same, I would say that our courts are the *servants* (our italics) not the masters, of the general public, and that nothing but the highest respect should be held for our American judiciary, even though it may at times err."

The report then proceeds to call attention to the newspaper attacks on the dry law, what the so-called liquor interests are doing, and that many "wet" bills will be before the next Congress which will receive over 12,000,000 citizens' signatures for the repeal of our existing prohibition laws, and the church must rally and meet the oncoming titanic struggle, suggesting the necessity of having thousands of dollars at once for the circulation of literature and other uses, and finally, under the head of STATE BECOMING AROUSED, says: *"The above is a dark picture, but it should be understood by the righteous people of our state and nation before it is too late."* (Our italics.) Then follows a statement as to what is being done on what is termed "Field Days," to arouse the people to contribute money, and referring to the fact that at Fort Wayne $3,000 in cash and subscriptions and in St. Joseph County "three dozen public meetings were held," resulting "in cash and subscriptions over $5,000" for the cause. *"If the entire state can be thus aroused between this and the time of the primaries, we hope to be able then after the election in November to present again a solid dry delegation, both in the Senate and in the House of Representatives, from Indiana. . . . And we trust that the next election will give us a Supreme Court that will be dry and not wet."* (Our italics.)

The information then alleges that these respondents always expend large sums of money in every general election and particularly in elections where judges of

this court are elected; that at the time the pamphlet was published and circulated as aforesaid, and by Shumaker caused to be reprinted and circulated in the Indiana edition of the "American Issue," there were pending in this court for decision many appeals from liquor law convictions wherein the question of the admissibility of evidence obtained pursuant to alleged unlawful searches and seizures was involved. Twenty-one of these cases are referred to by number, and, for the purpose and object of controlling the decision of these cases and all others of like character pending or which might be appealed, the respondents entered upon a plan and scheme and are putting the same into execution, as clearly appears from the false and defamatory matter published and circulated as aforesaid, to intimidate and influence the judges and thereby to control the decisions of the court in such cases by falsely reporting certain decisions of the court, by falsely stating the personal attitude of the judges toward the prohibition cause, by imputing to the judges false and dishonest motives in rendering decisions in this class of cases, and thus and thereby to mislead and prejudice the people of the state against the court and its personnel, and to keep and hold the judges under the constant fear of being, by respondents, misrepresented as to their character, their integrity, their work as judges, and of political defeat for re-election, unless the decisions of the court conform to the opinions and desires of respondents, regardless of the command of Art. 1, §11 of the Constitution of Indiana; that, as evidence of respondents' plan, scheme and purpose of controlling this court's opinions in the particular class of cases, Shumaker, a member of the clergy and head of the Anti-Saloon League, having a large acquaintance with the clergy and church membership of the state, when permitted so to do, occupies church pulpits for the purpose of arousing people to

political action and for soliciting funds to be used largely to control political nominations for public office, or for the election of public officials.

The information, in furtherance or in aggravation of the alleged contempt, and as evidence of the respondent's willful purpose to control the decisions of this court in the class of cases to which reference has been made, refers, by exhibit, to a certain article in the Indiana edition of the "American Issue" of date October 18, 1924, concerning one of the judges of this court who was at that time a candidate for re-election. A portion of the article so published and circulated is set out and characterized as a false statement of and concerning the opinion in what is styled "the Batts case." The article stated that the judge—then a candidate for re-election—*"wrote an obiter opinion in the Batts case where he practically held that an automobile cannot be searched without a search warrant. He also made the statement in this opinion that the vessels which had been thrown out of the car in the Batts case smelled as if there might have been whisky in them, when, as a matter of fact, the uncontradicted evidence shows that these vessels contained twenty-three gallons of white mule."* (Our italics.)

Under the heading "FEDERAL AND STATE SUPREME COURTS DIFFER," the reader is referred only to the cases of *United States* v. *Borkowski* (1920), 268 Fed. 408, and *Dumas* v. *State* (1925), 197 Ind. 123, and the article assumes to state the similarity of facts in both cases and the rulings. Thus, of the Borkowski case, he says: *"It is held that where officers smelled raisins cooking and saw a light in the cellar of a house and persons there moving around and their experience told them that the odor of boiling raisins meant that a crime was being committed, they had a right to enter and seize the utensils employed, and that as an officer may arrest when he actually sees the commission of a misdemeanor, he may do the same*

*if the sense of smell informs him that the crime is being committed."* In the second case, *"appealed from Vigo County, our court takes the opposite view. In this case, the officers distinctly smelled mash cooking in a small house. They entered, found a still and arrested the owner. The court reversed the case, holding that the officers had no right to enter the house without a search warrant."* (Our italics.)

Respondents moved to strike out certain parts of the foregoing information, and thereafter filed a joint and several response, and later Shumaker separately filed a second and additional paragraph of response, and from these answers under oath, it appears, in substance, that Miles and Martin had nothing to do with the preparation or publication of the pamphlet or with its being reprinted and circulated in the American Issue, except that respondent Martin is and was a trustee of the Anti-Saloon League, and, by the joint and several response and separate additional and supplemental responses by Shumaker, it appears that the board of trustees of the Indiana Anti-Saloon League approved the so-called report of Shumaker and ordered it published in pamphlet form for distribution, and to be reprinted in the Indiana edition of the American Issue February 6, 1926.

They each deny that they were parties to any plan or scheme to degrade, impede or influence this court. They separately state that they are citizens and residents of the city of Indianapolis, and that Shumaker, for more than nineteen years, has been superintendent of the Indiana Anti-Saloon League; that one of his duties is to make reports to the trustees of the league "of the progress and work of said league, the general status of the matters pertaining to the cause of temperance, prohibition and liquor-law enforcement, and concerning what has been accomplished, and conditions generally

in that connection"; that Shumaker, in accordance with his duties, prepared and presented to the board of trustees the report exhibited in the amended information, which was approved and adopted by them and ordered published; that after editing it, under the supervision of the headquarters committee, he published the same in pamphlet form and caused it to be printed in the American Issue "pursuant to the direction of said board of trustees"; that the objectionable parts of the report or pamphlet were not ordered deleted by the trustees of the league; that the American Issue is the official organ of the league and it was published therein for the benefit of its subscribers, and for the benefit of the officers, trustees and subscribers to the league and mailed to them as a part of the consideration for their subscription. Five times in this paragraph, he asserts that the statements in the pamphlet and as republished "are not contemptuous." It is then denied that the respondents, at any time, by any of the means, plans, schemes and designs alleged or referred to in the amended information or otherwise, or in connection with the annual report or the publication thereof, or by means of either of them, or by means of any statement contained therein, deliberately, intentionally, purposely, maliciously or willfully made any false statement or report of any kind or character concerning the court or any of its decisions or proceedings pending, disposed of, or otherwise, or any of its members with any such intent, purpose or design. Shumaker denies any purpose to intimidate or to put the court in fear, or to control or influence its decisions; that any statements contained in his report were made with reference to any pending case, or that they concerned any case other than those specifically mentioned in the report; and denies any knowledge of pending cases mentioned in the information, or that any of such cases involved questions of the admissibility in evidence of

articles seized pursuant to searches and seizures which were alleged to be unlawful. He denies that he made any statement or report at any time or under any circumstances with any intent or purpose of being disrespectful to the court or any of its proceedings or decisions, or that he had any purpose to do anything in contempt of the court, or that he had any intent or purpose of encouraging disrespect for the court or for any of its decisions.

Shumaker says that, "for more than twenty years last past, he has been a member of the clergy, during nearly all of which time, he has been superintendent of the Anti-Saloon League of Indiana, and editor of the Indiana edition of the American Issue; that, during all this time, he has developed a state-wide acquaintance with a large portion of the clergy of the state, as well as with the members of many of the churches of the state, that among these people he has procured a large number of subscribers to said American Issue; that, at all times, he occupies the pulpits of churches in the state who are interested in the purposes of the Anti-Saloon League and not otherwise, and for the purpose of arousing the people to political action in furtherance of the purposes of the Anti-Saloon League in the matter of electing men of dry sentiment to office in furtherance of the purpose of the Anti-Saloon League, and not otherwise. And they solicit contributions of money on such occasions to be used for the purposes of the Anti-Saloon League," which purposes, he previously states in his response, are the maintaining of offices, officers and employees "who devote their entire time and attention to its affairs," which involves a large expense and outlay in carrying on its work, and that the money collected by means of Field Days "is used and expended in payment of the legitimate expenses of said league in that connection and not otherwise"; that the language in the report

or pamphlet concerned the "results of certain Field Days wherein subscriptions were solicited and the report contained the statement of what the Anti-Saloon League hoped to achieve if given support, and the only purpose of said quoted excerpt was to so report and to advise said persons interested in said Anti-Saloon League of the work it considered necessary in furtherance of its purpose in Indiana, to wit, the election of members to the legislature who will be more militantly dry than the last Indiana legislature, to retain the Indiana liquor laws as now constituted, and to elect individuals to the Supreme Court whose sentiments are dry, and that respondent, by said publication, or said Anti-Saloon League, by said action, has no intention other than the legitimate furtherance of its purposes, and all allegations to the contrary are false and untrue." He states that, as superintendent of the Anti-Saloon League, he is active in general elections, and "does expend money legitimately in general elections, but not particularly more in elections where judges of this honorable court are elected; that such expenditures are of a legitimate character at all times, and in furtherance of the purpose of the Anti-Saloon League." That he did not, "for the purpose of defeating one of the judges of this court who was a candidate for re-election and who theretofore failed to yield to intimidation by respondent, cause to be distributed, printed or published any statement in said American Issue dated October 18, 1924," but that such article was part of a report by the Anti-Saloon League of its opinion of candidates for office, both in the counties and state, as well as nationally.

He refers to the Callender, Flum and Dumas cases, saying that they were all disposed of and not pending at the time the report was made, and that his statement with reference to the Borkowski and Dumas cases was that of a layman and not published with intent to falsify

or misrepresent the decisions; that he "did not deliberately, falsely or maliciously state, in substance or otherwise, that the liquor interests have gained control of this court as alleged in said amended information, and the statements alleged in said amended information were not issued or uttered with the intent to convey said impression." That he had not undertaken to determine for the people of the State of Indiana what the decisions of the Supreme Court ought to be in liquor cases, or that §11 of Art. 1 of the Constitution of Indiana ought to be disregarded. He then gives his reasons for making the statement concerning the decisions of this court which are, in substance, that in his opinion the earlier decisions of the Supreme Court of the United States and those of thirty states are the better rule of law for the promotion of justice than the rule more recently adopted by the Supreme Court of the United States and by the Supreme Court of this and other states. He justifies his position by the following statement. "His reasoning was, that the one who was guilty of crime was an outlaw, and was therefore not entitled to the protection of constitutional guaranties, and that since the evidence of guilt was undisputed, the suppression of such evidence has the effect of allowing the guilty to escape punishment and that the effect of such ruling was to defeat justice, and that, in the interest of justice, the better rule would be to admit the evidence regardless of the manner in which it was obtained."

At this stage of the proceedings, both the state and the respondents moved for judgment—the state for judgment of attachment and punishment, and the respondents for their discharge. Thereupon, the court, over the objection and protest of the respondents, invited Honorables George Dix of Terre Haute, then president of the Indiana Bar Association, Dan W. Simms of Lafayette, Evan D. Stotsenburg of New Albany, ex-attorney-general of Indiana, C. C. Shirley, Moses B.

Lairy and Fred C. Gause of Indianapolis, the latter
two ex-judges of the Supreme Court of Indiana, to act
as *amici curiae* in this proceeding, and to submit a brief
on the questions involved. These gentlemen were en-
tirely disinterested. They accepted our invitation and
have submitted a very able and exhaustive brief for our
consideration. However, we may say that the objec-
tions and protest on the part of the respondents did not
in the least question the high standing or integrity of any
of these gentlemen in any particular, nor did they chal-
lenge any one of them because they were not well and
favorably known to the bench and bar, or were not
among the recognized leading lawyers of this state.

After the *amici-curiae* brief was filed, respondents filed
a supplemental response, wherein they refer to the Batts,
Callender, Flum and Dumas cases and attempt to both
justify and excuse responsibility for the statements in
the Shumaker report to the trustees of the Anti-Saloon
League.

Shumaker admits that the judgment in the Batts case
was reversed because of error in overruling the motion
to quash the affidavit, and then asserts that the court,
for the purpose of avoiding a retrial on an amended
affidavit, "held that the evidence in the case could never
be used and respondent believed that such holding had
the effect of making impossible the further trial of the
defendants." In the Callender case, the judgment was
reversed and a new trial ordered; that, in part, as to the
Batts case, and entirely so as to the Callender case, he
was misled at the time he made his report by the thought
that the court's opinion was based upon an actual refer-
ence to the transcript of the evidence rather than that
furnished by counsel in their briefs. He then refers to
certain excerpts said to be taken from the transcript of
the evidence in justification of his claims. He next
refers to the Flum case, and, following it, the Dumas

case, quoting selected paragraphs or sentences from each of the opinions and on which he essays inferences to suit his purpose. Both of these cases were reversed and new trials ordered. He says of the Callender and Flum cases, he "had no purpose to make a false report of the decisions of said respective cases, and does not now understand that, as a general proposition, his statement or report of said decisions were materially misrepresentations of what actually occurred. Technically, from a legal standpoint perhaps, said statements may not be entirely accurate"; that he understands that none of these cases was retried; that "he compared the two decisions (Borkowski and Dumas) by adopting a statement of facts in each case which he, respondent Shumaker, believed to be true," and drew the conclusion that they were in conflict as stated in his report.

On the part of Shumaker, the remainder of this response is practically a reiteration of statements covered by his former answers, other than that he now asserts, in substance, that this proceeding is an attempt to abridge his inalienable and constitutional rights to speak, write, print and publish what may seem to him to be proper, and that this court is without right or jurisdiction to punish for contempt. Both E. A. Miles and Jesse E. Martin again deny having anything whatever to do with the preparation of the Shumaker report or of its publication.

In reading the supplemental response filed more than four months after the filing of the information, it will be noticed that respondent Shumaker does not say or claim that he made the so-called report of the cases mentioned therein from an examination of the record, briefs of counsel, or opinion of the court; nor does the source of his information in that respect appear from either of his other responses. He includes excerpts claimed to be taken from the record in two of the cases, and then pro-

ceeds to draw inferences from them as a premise for an excuse and for saying that he had no intention to malign or scandalize the court by the statements in his report to the board. These evidently after-thought matters, by which he now seeks to shield himself from or to mitigate merited punishment, fail entirely when the asserted facts in his various responses are considered in connection with the falsity of his report and the real outstanding facts of the cases he misinterprets.

In fairness, and in the hope that the reader of this opinion may draw therefrom a correct impression of the demeanor and course of action of these respondents, we have taken the time and space for an extended statement of the various responses prepared under the critical supervision of counsel. We regret that it has become necessary—an absolute duty—that we determine the status of respondents relative to their conduct toward this court in a report of its rulings and decisions formally brought to our attention. It is not our purpose to notice references in the report or in the responses concerning the judges individually other than where such references exhibit the state of mind of the maker of the so-called report, or as indicating the result to be thereby obtained.

Certain statements in the report are alleged to be contemptuous and, if so, it becomes our duty, as for a public wrong, to assess proper and adequate punishment to the end that the court may maintain its standing, dignity and unrestrained enforcement of its lawful powers in an orderly manner. All of the statements in the report pertaining to this court must be considered and analyzed as one document and not disconnected, as respondents would have us do. They together reflect an odium which taken singly, in some instances, might not be seriously considered. However, any act, conduct, or directing agency pertaining to pending pro-

ceedings "intended to play on human frailty, and to deflect and deter the court from the performance of its duty, and drive it into a compromise with its own unfettered judgment, by placing it, through the medium of knowingly false assertion, in a wrong position before a public which has little opportunity to investigate the facts and ascertain the truth," regardless of results, "clearly constitutes 'an obstruction to the administration of justice,'" and is contemptuous and within the inherent power of the court to punish. *United States* v. *Craig* (1920), 266 Fed. 230; *Michaelson* v. *United States* (1924), 266 U. S. 42, 65, 45 Sup. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451; *Little* v. *State* (1883), 90 Ind. 338, 46 Am. Rep. 224; *Ray* v. *State* (1917), 186 Ind. 396, 114 N. E. 866; *Dale* v. *State* (1926), 198 Ind 110, 150 N. E. 781.

While the case of *Coons* v. *State* (1922), 191 Ind. 580, 134 N. E. 194, 20 A. L. R. 900, was in the court below, circuit judge William A. Thompson well said: "The foundations of the state, the orderly stability of society and the welfare of the citizen depend upon the enforcement of law, and especially the criminal law. There can be no enforcement of law except through the agency of the courts. And whatever tends to lower respect for courts and for their decisions and integrity and honor, and whatever brings the law into contempt is a public calamity which, if continued, will eventually lead to anarchy and bolshevism."

The report refers to and attacks "our Supreme Court," "our own State Supreme Court," "State Supreme Court," "a Supreme Court," and "our courts." The real question here for decision, and the one to which we limit our attention, concerns the Supreme Court of Indiana.

The judiciary is one of the three departments of government, and, except in a few instances, is vested

with all the judicial power of the state as a constituent branch of the government itself. *State, ex rel.,* v. *Noble* (1889), 118 Ind. 350, 21 N. E. 244, 4 L. R. A. 101, 10 Am. St. 143.

The legislative department has indicated its approval of the power of courts to punish by fine and imprisonment for contempt of its authority (§1336 Burns 1926), and also by providing that "every person who shall falsely make, utter or publish any false or grossly inaccurate report of any case, trial or proceeding, or part of any case, trial or proceeding" while the court has jurisdiction thereof, and before it is determined and ended, shall be deemed guilty of an indirect contempt of court punishable by a fine or imprisonment, or both, in the discretion of the court inflicting the same, not exceeding $500, or more than three months' imprisonment. Acts 1879 (Spec. Sess.) p. 112; §§1080, 1081 Burns 1926.

When it is known that the power of inferior courts to punish for contempt has been questioned by respectable authority, the reason for the foregoing legislation is apparent—not that it confers any additional power on courts of superior or general jurisdiction, but that such power may be unquestionably extended to courts of inferior jurisdiction to punish for contempt certain enumerated acts. 13 C. J. 48, §63; 6 R. C. L. 517, §29.

In *Little* v. *State, supra,* it is said: "The judiciary is a co-ordinate department of the government, and is not a mere subordinate branch, dependent for existence and power upon the legislative will. Purely judicial powers, inherent in courts as of the essence of their existence, are not the creatures of legislation, and these powers are inalienable and indestructible. Among the inherent powers of a court of superior jurisdiction is that of maintaining its dignity, securing obedience to its process and rules . . . rebuking interference with the conduct of

business, and punishing unseemly behavior. . . . There is no doubt that the power to punish for contempt is an inherent one, for, independent of legislation, it exists, and has always existed, in the courts of England and America." See, also, *Cheadle* v. *State* (1887), 110 Ind. 301, 11 N. E. 426, 59 Am. Rep. 199; *In re Hayes* (1916), 72 Fla. 558, 73 So. 362, L. R. A. 1917D 192, Ann. Cas. 1918B 936; *United States* v. *Hudson* (1812), 7 Cranch (U. S.) 32, 3 L. Ed. 259; *State* v. *Shepherd* (1903), 177 Mo. 205, 224, 76 S. W. 79, 99 Am. St. 624; *State* v. *Zimmerman* (1925), 317 Ill. 197, 201, 148 N. E. 5; 13 C. J. 46, §62; 6 R. C. L. 515, §28.

At the time the report in question was made and submitted to the board of trustees of the league, and by that body, according to the uncontradicted evidence of Shumaker, ordered published in pamphlet form and in the American Issue, the official organ of the organization of which he is superintendent, it was a well-known fact that never during the entire history of the state was there as much litigation growing out of the violation of the liquor laws as that which followed what is known as the Prohibition Law of 1917, and especially the laws thereafter passed by our legislature under the pretext of strengthening the Volstead Act. As a result of this litigation, a stream of appeals found its way into this court, especially noticeable in 1922, and continuously increasing in volume each year until 1925, when this court was submerged by criminal appeals, largely due to amendments and changes in the original prohibition law in 1921, 1923 and 1925.

Without stopping to count the number of liquor-law violation cases pending in this court at the time of making the report in question, it would be safe to say there were more than 100 cases, which submitted innumerable questions, and at least twenty-five per cent. of these

presented the question of search and seizure, some of which, under the administration of a former attorney-general, were briefed on the part of the state by respondent Miles, one of the attorneys for the Anti-Saloon League and a legal adviser of Shumaker. Moreover, out of the 100 or more cases involving liquor-law violations decided by this court within the twelve or fifteen months immediately preceding the making of the report to the board of trustees and its action thereon, probably one-third of the cases thus decided embraced the question of search and seizure in some form. Out of the cases so decided, the author of the report selected four—Batts, Callender, Flum and Dumas—and, by apparent studied efforts to delude readers of the report into a false impression of the court's attitude in such cases, garbled, falsified, and misrepresented the facts thereof and the law therein declared. Final disposition of three of these cases—Batts, Callender and Flum—had been made, but the Dumas (Adonia) case and others were still pending, subject to a petition for a rehearing or modification by the court of its own motion.

Respondents Miles and Martin do not disclaim knowledge of our docket exhibiting liquor appeals, and, for respondent Shumaker to say, even under oath, that he did not know of such pending cases, when, as he says, he is giving all of his time to the prohibition cause, is but to trifle with the court.

To say that a statement or thing is true, or that certain conditions exist which are false and susceptible of such knowledge, or to falsify language by misstating it or by material omissions misrepresent, as in this case, court rulings, thus clearly informing those who are relying and known to be relying upon the truthfulness of such statements, cannot be excused by merely denying any intention of deception. The language of the publication is not technical. It was

adroitly drawn to avoid the facts and give it semblance of truth. Colloquiums or innuendos are unnecessary in order to determine to whom the language in question applies, or to give it a defamatory meaning.

We do not, nor does any one, contend that judges are beyond fair and respectful criticism for either personal or official conduct. Honest and decent criticism may be helpful in the due administration of the law, but a knowingly dishonest, false or libelous publication, impugning the motive, honesty and integrity of the court or of its personnel because of acts done or being done in the administration of justice, is not a criticism in the sense of aiding the court to correct error. Such acts are inconsistent with the public interests and tend to destroy the usefulness of courts created to aid in the preservation of law and order. For us to pass unnoticed conduct unquestionably intended and calculated to arouse public prejudice against the judges in the performance of their judicial functions, thus destroying the faith of the people in the judiciary and respect for the law, would be so cowardly that it would be contemptible and a disgrace.

As said in the case of *In re Fite* (1912), 11 Ga. App. 665, 680, 76 S. E. 397, 404: "The power of the judiciary rests upon the faith of the people in its integrity and intelligence. Take away this faith, and the moral influence of the courts is gone and respect for the law is destroyed. Other departments of the government may outlive unjust criticism, and may still render service to the people, even when unfairly assailed, but when confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence, and crime. The one element in government and society which the people desire above all things else to keep from the taint of suspicion is the administration of justice in the courts." And again on

page 679 (76 S. E. 404): "If courts fail to enforce respect, if they do not strive to preserve their independence and to maintain inviolate their judicial integrity, they will not only lose their own self-respect, but will be recreant to the duty they owe to the state. If the court is scandalized, the integrity of its judges impeached by gross, defamatory libels of their character and their decisions, the consequences are far more hurtful than in cases of direct contempts, committed in their presence."

This court was created by the people upon the adoption of the Constitution of the state as one of the departments of government. It has the power, not only to define criminal contempts, but also to punish for such attacks. One of the outstanding elements of the report is the purpose to excite people into the false belief that the majority of the present personnel of the court is "wet." The word "wet" so used has a well-understood meaning: "One in favor of allowing the sale of intoxicating liquors." Webster. To convey this thought to the membership of the league and its subsidiary organizations was not alone for the purpose, we think, of scandalizing and bringing the court into distrust and to create a false impression of its judges, and thus to effectively embarrass the administration of justice in a class of pending cases but to thereby incite the people into the belief that one of the imminent causes for the "titanic struggle" they would be called upon to meet would be the election of a Supreme Court that would be dry and not wet. Thus the selfish motive of the author of the report appears by his appeal to the people to contribute to a fund for use in nominating and electing officers who will have the initials of approval of his organization.

The report in question, admitted to have been circulated among members of the league and broadcasted through the "American Issue," practically states that

the liquor interests control our courts. From the number of times this court is mentioned in the report, it will not do to say that it was excluded from the charge. The law-abiding people are called upon to nominate and elect judges who "will give judicial decisions carrying out in full and effective manner both the letter and spirit of our Constitution and laws enacted thereunder."

According to the Shumaker idea of the Constitution, as set forth in his response, all persons guilty of crime are outlaws and not therefore entitled to the protection of constitutional guaranties. That is the rule announced for this court to follow, regardless of the oaths of its personnel to support the federal and state Constitutions. For a failure of this court to so comport itself, the members thereof are referred to the fate of one of the present judges who was up for re-election in 1924. Thus, we have an autocratic threat of power to be asserted unless this court yields its judgment in the administration of justice in the particular class of cases mentioned so as to coincide with the prejudiced theories and notions of one whose livelihood is sustained apparently by donations from the people, obtained either by fair or false means.

Respondent Shumaker admits that he is a member of the clergy and thereby gains admission to the pulpits of various churches of the state which he uses to arouse the people of the state into contributing money for the furtherance of the cause he represents, and for use in primary and general elections for the purpose of electing persons to office, members of the Supreme Court, who are "dry." The word "dry" so used means a prohibitionist. Webster. Moreover, it clearly appears from the report, supplemented by admissions in his response, that he is capitalizing the fact of his clergy membership to impress the people with the truthfulness and fairness of his statements that this court, by splitting judicial

hairs in liquor cases, holds that the guilty "must be turned free," and "substantial justice has been defeated repeatedly." These statements are false.

The judgment in the Batts case was reversed for error in overruling the motion to quash, but the opinion refers to the evidence, and the statements of law therein are based upon the evidence as recited in the opinion. That part of the opinion was merely advisory of this court's views in case of a retrial upon a new affidavit, and suggested in what respect the evidence as detailed was insufficient. The falsity of the report was in stating that the opinion "practically held that an automobile cannot be searched without a search warrant," and that the uncontradicted evidence shows that the vessels, kegs, and jugs found on the side of the road were thrown out of the Batts car and contained twenty-three gallons of "white mule." The testimony of Batts and his wife was that they did not throw anything out of the car, that they did not have any vessels containing "white mule" whisky in the car.

In the Callender case, the judgment was reversed and a new trial ordered. At the time of the trial, neither the affidavit for the search warrant nor the warrant itself could be found. Appellant contended, and in his brief recited evidence to sustain his contention, that the authority for making the search was signed by the chief of police, and that no search warrant was issued by a magistrate or court. The conviction in that case, as appears from the evidence brought to the attention of this court, was obtained by evidence procured by an unlawful search. No magistrate or judge gave any evidence on the subject, and the police were not certain as to who signed the instrument upon which they acted.

A new trial was granted in the Flum case. In that case, a search warrant was issued upon an affidavit describing the premises as "Section D, Beech Grove,"

approximately 2,500 feet long and 1,800 feet wide, comprising 125 lots, upon which were twenty-five separate buildings, all but two of which were dwelling houses. Flum owned five of these lots and a two-room dwelling house. The description of the premises to be searched in the affidavit was indefinite and uncertain and wide of the constitutional requirements.

The Borkowski and Dumas cases are easily distinguishable. In the Borkowski case, while the officers were engaged in a lawful search, they smelled raisins in the process of cooking somewhere. They saw a light in the cellar of a house two or three doors away and persons moving around. They went to the house, entered the cellar, and found a still in operation. In the Dumas case, the officers had completed the search of premises for which they had a warrant. The Dumas home was a mile and a quarter away. The officers knew of no wrong being committed by Dumas at the time they left the premises searched to exploit the surrounding country. They crossed peoples' farms and entered the farm occupied by Dumas without the semblance or pretext of any authority. While on the Dumas farm, the prohibition officer alone smelled the odor of cooking mash, an entirely different state of facts from that exhibited in the Borkowski case.

Our attention has been called to excerpts from public addresses in Senator Beveridge's book on "The State of the Nation," chapter on "Common Sense and the Constitution." One of these by Justice Brewer, speaking to the subject of "Abraham Lincoln," said:

> "It is a mistake to suppose that the Supreme Court is either honored or helped by being spoken of as beyond criticism. On the contrary, the life and character of its justices should be the objects of constant watchfulness by all, and its judgments subject to the freest criticism. The time is past in

the history of the world when any living man or body of men can be set on a pedestal and decorated with a halo. True, many criticisms may be, like their authors, devoid of good taste, but better all sorts of criticisms than no criticism at all."

Also, as bearing upon what may be considered as proper criticism of the courts, we have the statement of Felix Frankfurter, a member of the law faculty of Harvard University:

"A steady stream of *enlightened* and *disinterested professional* (our italics) criticism must play upon the work of the Supreme Court if its transcendent function in exercising a virtual veto power over national and state action is to be saved from destructive obscurantism."

The last, by Roscoe Pound, Dean of the Harvard Law School, before the American Bar Association in 1926, in speaking of economic transition bringing about complaint with reference to the functioning of our institutions, social, political, economic and judicial, said:

"All of them are subject to a strain in the transition from an agricultural, rural, pioneer society to the urban, industrial society of today. But the courts are peculiarly subject to that strain for several reasons. One is, while in the period of political transition, we subjected our judges generally to popular election, often for short terms, we still retain the common-law tradition that puts the judge upon a different plane from other public officers."

He then refers to how the administrative officer may defend his conduct, which is not open to the judge.

"Every sort of argument and every sort of misrepresentation can fill the air and he must sit on the bench in quiet dignity and administer justice according to law. I think it is a good thing that that is still our tradition. But it does unquestionably subject our administration of justice to some strain."

He then refers to the muck rakers' misrepresentations of judicial decisions of twenty-five years ago, which went unchallenged in the periodicals.

"Occasionally those misrepresentations crop up today in most unexpected quarters, and make us realize that *there is nothing so absurd or out of line with the ordinary experience that the lay public will not believe it when asserted of law and courts.* (Our italics.) That curious phenomenon, I suppose, is largely due to a situation that, as it were, puts one of the two judicial feet in politics and does not provide the judicial incumbent with the ordinary political means of meeting the exigencies of political life."

He next refers to the enormous development of the manufacturing, marketing and commercial institutions and the difficulty which the courts have encountered in trying to deal with our nineteenth century legal conceptions.

These men, able and well learned in the law, by these addresses certainly did not intend to be understood as saying that courts have no protection against pernicious and libelous attacks which tend to endanger the rights of parties in pending cases, or that will prevent a calm and dispassionate discussion and investigation of such causes, so necessary to their just and proper determination, or, in short, tend to impede or defeat the due administration of justice. Such an understanding would be contrary to the pronouncement of every court having to do with such conduct, both in England and America.

While Justice Brewer was an associate justice of the Supreme Court of the United States, that court, in the case of *Patterson* v. *Colorado* (1907), 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689, Mr. Justice Holmes delivering the opinion, dismissed the writ of error because no federal question was involved. The

First and Fourteenth Amendments to the federal Constitution were considered, and, with reference thereto, it was said:

"But even if we were to assume that freedom of speech and freedom of the press were protected from abridgement on the part not only of the United States but also of the states, still we should be far from the conclusion that the plaintiff in error would have us reach. In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous restraints* upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. *Commonwealth* v. *Blanding* (1826), 3 Pick. 304, 313, 314; *Respublica* v. *Oswald* (1788), 1 Dallas (Pa.) 319, 325. The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not all. *Commonwealth* v. *Blanding, ubi sup.;* 4 Bl. Com. 150. In the next place, the rule applied to criminal libels applies yet more clearly to contempts. A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice, because even a correct conclusion is not to be reached or helped in that way, if our system of trials is to be maintained. . . . What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put."

The report in question states "that our courts are the *servants* not the *masters* of the general public." This statement has an important bearing in many ways and sheds additional light on points already considered. It shows that the author of the report has an erroneous conception of the functions, duties and obligations of courts, and furnishes an explanation of his general attitude toward courts. It is true that courts are not the masters of the general public or of any part of the general public, not even of a single individual; but it is equally true that courts are not organized to decide questions of law according to the wish of the power to appoint, or to elect, or otherwise. State courts in this country acting within their jurisdiction are subservient to the Constitution of the United States, the Constitution of the state in which they are organized and to the established law of the land only, and to no other earthly power. It would be monstrous if any political party or any body or association of people, having the power to elect or defeat judges, could control or dictate decisions of courts. This condition would exist if courts were the servants of those holding the power to elect.

In determining a question presented for decision, a judge is not free to act in accordance with his personal wishes, desires or predilections, for the reason that judicial action must be controlled by a consideration of law, only as applied to the facts of the particular case. The judge must determine what the law applicable to the case is and he must apply the law to the facts and the result of this process will determine the decision. A decision thus reached is what the law requires, and is not necessarily what may meet with the approval of any person or class of persons who may be directly or indirectly interested in the result. So long as we have courts composed of men who have in-

tegrity and courage sufficient to enable them to follow the law as the sole guide to judicial action, we shall have a government of law and not a government of men. It may be that a decision so reached may not meet with general public approval, but courts should be indifferent to any consideration of that nature. The trend and weight of public opinion and sentiment on questions of importance is subject to change, but sound legal principles founded on reason and justice should never change. It is, therefore, apparent that courts cannot be the servants of the people in the sense that they must conform their decisions to meet the desires of any class or even of a majority of the people.

Shumaker and those he represents were not interested in the result of any specific case, but they were interested in the result of a class of cases in which were involved violations of the law on the subject of intoxicating liquor. Some of these cases had been disposed of, others were pending, and still others would be filed in the regular course of events. The publication contained untrue criticisms of the decisions of the court and veiled threats to defeat for re-election certain members of the court designated as "wet," and in substance called upon the organization to substitute in their places judges who were dry and who would regard themselves as "servants" of those who placed them in office and who, in return, would gladly do their bidding as the price of being retained in office. Of course, the criticisms and threats made could not have the effect to control the decision of cases which had been finally disposed of and of which the court had lost jurisdiction. Such was not their purpose; but they were well calculated to affect the mind of a timid judge who might be concerned as to his re-election and to influence his decision improperly in like cases which were pending or which might be later filed.

Shumaker had two lawyers—Miles and Martin—at his command to advise him on questions of law and the rulings of this court as exhibited by its opinions. However, he assumes entire responsibility for the statements in his report, but says that he is not alone accountable for its being printed in pamphlet form or its publication in the American Issue. He admits editing the report under the supervision of the headquarters committee, but claims that its publication in pamphlet form and as reprinted in the American Issue was pursuant to the order of the board of trustees. It will be noticed that respondent Martin does not deny that he, as one of the trustees of the league, participated in ordering the publication of the report, as stated by Shumaker in his response. This admitted activity on the part of Martin in disseminating the false and scurrilous statements concerning this court cannot be excused on the theory that he did not, as an individual, collaborate with Shumaker in the preparation of the report, and had nothing to do with its publication. This court, therefore, upon the case thus submitted for its determination, finds respondent Ethan A. Miles not guilty, and further finds respondents Edward S. Shumaker and Jesse E. Martin each guilty of contempt of court.

It is now, therefore, ordered that the Clerk of the Supreme Court of Indiana issue a writ of attachment to the sheriff of said court commanding him to bring forthwith before the court Edward S. Shumaker and Jesse E. Martin for sentence and judgment upon the aforesaid finding of guilty.

Travis, C. J., and Willoughby, J., concur.
Gemmill and Martin, JJ., dissent.

### Dissenting Opinion.

[Filed August 5, 1927.]

Martin, J.—I was not a member of the court at the time this action was begun, nor at the time of the publication of the article which the Attorney-General, in his amended information, has alleged to be contemptuous. For this reason I preferred not to participate in the decision of this case, but, at the request of my colleagues, and on their suggestion that by reason of the fact that I was not a member of the court at those times and did not participate in the decisions of the court that were criticized by the respondent, I would be in position to consider the matter impartially, I have consented to sit in the case.

After a careful consideration of all the facts alleged in the information, and in the answers of the respondents, I am unable to agree with the finding and order made by the court and respectfully dissent therefrom.

Opportunity has not been afforded, however, in which to prepare, in as careful a manner as I should desire, a statement of the reasons why I do not concur in the opinion which has been adopted by a majority of the court. While this proceeding has been at issue for more than a year and was assigned for the preparation of an opinion more than seven months ago, the opinion was first presented to the court for consideration, and discussion day before yesterday. Previously I had examined the pleadings and briefs herein, which cover more than 300 legal size pages of typewritten matter and had made some notes regarding the same, but I did not attempt, in advance of the preparation of an opinion by my colleague and of the adoption or rejection thereof, to prepare a statement of my views in the form of an opinion. But owing to the fact that the court has very properly determined that final action in this matter should be had without further delay, I shall endeavor to point out, as clearly as possible in the limited time at

my disposal, the reasons for my dissent.

The principal indirect or constructive contempt alleged was the publication of the annual report of the state superintendent of the Anti-Saloon League made on January 19, 1926, to the board of trustees of that organization. This report was printed in pamphlet form and distributed to members of the league and it also appeared in the American Issue, Indiana edition, a newspaper published by the Anti-Saloon League at Westerville, Ohio. The other alleged constructive contempt was the publication of a statement regarding one of the judges of this court in the American Issue, almost three years ago, during a political campaign. The report of the superintendent to the trustees covers about three pages of the newspaper and contains between 6,000 and 7,000 words. Only a small portion of it is devoted to a discussion of the liquor law and the decision of the courts in liquor cases. Some mis-statements are made as to just what certain decided cases have held—mis-statements that one who is not trained in the law is apt to make in discussing technical legal questions (the respondent Shumaker is a minister)—but it appears to me that all the criticism therein contained is directed toward the judgment or reasoning of the court and not against the integrity or honesty of the court or of its members.

I shall set out in paragraphs numbered I to VII those parts of this report, the publication of which the Attorney-General alleges has rendered the respondents in contempt of this court, together with my comments on each of the paragraphs. Considered calmly and deliberately, in the light of the constitutional guaranty of free speech and writing, and with a tolerance for the opinions and convictions of others which may differ from our own, I do not believe that these paragraphs which follow and on which this action is based, considered separately or collectively, as published in the respon-

dent's report to the board of directors or in the American Issue, or with any reasonable intendments, can be held to be contemptuous.

The information does not appear to charge that the respondent's statements were false in fact, but it alleges that the effects which the statements produced were false and were intended to be false. I believe that the intendments, constructions, inferences and imprecations contained in the Attorney-General's amended information are unwarranted, and that it was only by adopting them that the court has arrived at the conclusion that respondents are guilty of contempt.

I. *"A majority of that court (the Supreme Court of Indiana) is at least liberal in its sentiments."*

The word "liberal" means independent in opinion, broadminded, free from bigotry, not narrow or contracted in mind but inclined to welcome new ideas and reforms. The use of this word as here applied to the judges who constitute a court cannot reasonably be held to mean that the judges do not believe in enforcing the liquor law as it exists and that they "permit that fact to enter into their decisions," as the Attorney-General has interpreted it. And its use, even in the most extreme colloquial acceptance of the term, as one who is not favorable to prohibition, certainly does not justify the conclusion of the Attorney-General or of the majority of the court that the respondents meant to impute a lack of integrity to the court or any of its judges or meant "that at least a majority of the judges of this court are controlled by the liquor interests." To say that a judge is liberal in his views on the prohibition question or is "wet" is not the equivalent of a charge that he is corrupt.

II. *"One of the members, Mr. Willoughby, is said to be bitterly hostile to prohibition, and if he had it in his power, would wipe all prohibition laws from the statutes."*

There is a well-defined distinction between criticism

of the court and criticism of a judge as an individual. The allegation that a judge is against prohibition and "would wipe all prohibition laws from the statutes" is far from an allegation that, so long as the prohibition laws remain on the statutes, such judge as a member of the court would not enforce the law as it exists. "In our jurisprudence the extraordinary action of contempt of court does not lie to heal the wounded sensibilities of a judge, it may be invoked only when the offending act impedes or disturbs the administration of justice." *Francis* v. *People* (1926), 11 Fed. (2d) 860, 865; see, also, 6 R. C. L. 512, §25; *State, ex rel.,* v. *Circuit Court, infra; Neel* v. *State* (1849), 9 Ark. 259, 50 Am. Dec. 209. The prosecution says regarding the statement: "If he had it in his power he would wipe all prohibition laws from the statutes," that "the plain meaning of this language is, that, if the particular judge had it in his power, he would *by his decision* wipe out all prohibition laws." I do not agree with this conclusion. It is quite common for judges who personally believe that the prohibition laws are unwise and that they should be repealed to enforce them to the letter. It is their duty to enforce the law as they find it, not as they would have it.

The common-law rule that the mere writing contemptuously of a judge was a constructive contempt of court "was founded on the obsequious and flattering principle that the judge was a representative of the king, but the theory of government which vests royalty with an imaginary perfection, and which forbids question or discussion, is diametrically opposed to the principles of a free and popular government, in which the utmost latitude and liberty in the discussion of business affecting the public and the conduct of those who fill positions of public trust that is consistent with truth and decency, is

not only allowable, but is essential to the public welfare." 6 R. C. L. 512, citing *Storey* v. *People* (1875), 79 Ill. 45, 22 Am. Rep. 158.

III. *"We trust that the next election will give us a Supreme Court that will be dry and not wet."*

So long as there is a prohibition issue and judges are selected by the process of popular election, discussions of "dry" and "wet" will be made preceding their elections, regardless of whether such discussions are pertinent or proper. A learned and conscientious judge acting as a court or a member of a court will decide or assist to the best of. his ability in deciding the cases strictly upon the questions of law or fact involved therein regardless of his personal or political views on the prohibition question, but a court in an indirect contempt proceeding should not undertake the useless and idle task of telling the electorate what they shall not consider in exercising their franchise.

This paragraph III may be said to refer to the members or member of the court who sought re-election at the election following the paragraph's publication. No. VII, *infra,* also was published when the judge mentioned therein was a candidate for re-election. Attention is called in this connection to the case of *State, ex rel.,* v. *Circuit Court* (1897), 97 Wis. 1, 72 N. W. 193, 65 Am. St. 90, 38 L. R. A. 554, where (as stated in 6 R. C. L. 510), it was held that "when a judge becomes a candidate for re-election public policy requires a full discussion of his past acts, subject only to the law of libel and not to the law of contempt." In that case an attorney had charged and a newspaper had printed the charges, several columns in length, that a judge had been partial and unfair in respect to his official conduct in the trial of causes and had been influenced by corrupt motives. The Supreme Court of Wisconsin said:

"In the present case it is of the utmost importance to bear in mind that Judge Bailey was a candidate before the people for re-election. Had he been a candidate for any other office, it would not be contended by anyone that the publications in question would afford ground for any other legal action than an action for libel in the regular course of the law; but the claim is that because he was a judge, and was holding court at that time, such unfavorable criticism of his past actions may be summarily punished by the judge himself as for contempt. Truly, it must be a grievous and weighty necessity which will justify so arbitrary a proceeding, whereby a candidate for office becomes the accuser, judge, and jury, and may within a few hours summarily punish his critic by imprisonment. The result of such a doctrine is that all unfavorable criticism of a sitting judge's past official action can be at once stopped by the judge himself, or, if not stopped, can be punished by immediate imprisonment. If there can be any more effectual way to gag the press, and subvert freedom of speech, we do not know where to find it. Under such a rule the merits of a sitting judge may be rehearsed, but as to his demerits there must be profound silence. In our judgment, no such divinity as this 'doth hedge about' a judge; certainly not when he is a candidate for public office."

IV. *"We well remember how the late Colonel Eli F. Ritter, pioneer attorney for the temperance forces in Indiana, used to say to us that when the liquor interests could no longer control the legislative or executive branches of the government, they would then turn their attention to our courts and seek to control them. I think this true today in a bigger sense than ever before,* and that the law abiding people of our states will have to strive for the nomination and election of judges of such high judicial equipment and such a sense of honor and loyalty to the Constitution and the laws enacted thereunder, that will give judicial decisions carrying out in full and effective man-

ner both the letter and the spirit of our Constitution and laws enacted thereunder."

The allegation of this paragraph is that the "liquor interests" (whatever they may be in this day of bootleggers, hi-jackers, moonshiners and home brewers) *seek* to control courts, *not* that this court is controlled by anyone. The prevailing opinion places in quotation marks as the statement of the respondent Shumaker the following: "that the liquor interests have gained control of this court." I am unable to find any such statement in any of the exhibits filed with the information. I submit also that the conclusion of the court that "the report in question . . . practically states that the liquor interests control our courts" is as unwarranted as its designation of Shumaker as "one whose livelihood is sustained apparently by donations from the people obtained either by fair or false means," is unfair and without the record.

This discussion can be considered to refer exclusively to this court and to be in contempt of it only by a wide stretch of the imagination. It follows immediately a paragraph entitled "Laxity of Courts," in which is discussed the number of cases and percentage of convictions in the *criminal court of Marion County;* it refers generally to "our courts," and is followed by a paragraph reading as follows:

> "To those who would urge that we are attacking the courts, and encouraging disrespect for the same, I would say that our courts are the servants, not the masters, of the general public, and that nothing but the highest respect should be held for our American judiciary, even though it may at times err. But, it should be remembered that the Republican party itself was born as a protest against a decision of the United States Supreme Court—the Dred Scott decision—and that Abraham Lincoln was one of many

liberty loving citizens who expressed strong criticism of that decision."

This latter paragraph certainly makes clear the respondents' position—that of a protest against what they believe to be *erroneous* decisions of the courts. What was said about the Dred Scott decision has often been stated as a fact, and honest criticism by one who believes a decision is erroneous and gives his reason therefor must always be permitted, if free institutions are to survive in this republic.

Abraham Lincoln, in his debates with Douglas and in his first inaugural address, scornfully refused to treat the decision of the Supreme Court of the United States in the Dred Scott case as permanently binding upon the people. "Somebody has got to reverse that decision," he shouted to Douglas, and it was Lincoln who there laid down the doctrine so strenuously objected to in the majority opinion herein, that the people are the masters of the courts. Certainly this court would not impute to the immortal Lincoln any intention or desire that courts should be "subservient" to any power other than "the Constitution of the United States, the Constitution of this state and the established law of the land" or that "any political party or any body or association of people, having the power to elect or defeat judges, should control or dictate decisions."

V. "Only about six state Supreme Courts have held that a defective search warrant should operate to let a guilty person go free. Our own state Supreme Court.is one of those six states.

"This court in the Callender case from Elkhart, and more particularly in the Flum case from Beech Grove in Marion County, and these reinforced by a number of later decisions, *has held that no matter how guilty a person may be of violating the prohibition law, even though he*

*might have as many as three stills in his house and be engaged in manufacturing a white mule that is poisonous and deadly in its effects—should there be any mistake in the search warrant—such a person must be turned free. We think that such rulings, coupled with the splitting of judicial hairs in many cases coming before our Supreme Court whereby substantial justice has been defeated repeatedly and has been to a great degree responsible for the great increase in the appeals of criminal cases to our state's highest judiciary."*

The cases referred to are *Callender* v. *State* (1922), 193 Ind. 91, 138 N. E. 817, *decided more than five years ago* and *Flum* v. *State* (1923), 193 Ind. 585, 141 N. E. 353, *decided almost four years ago.*

The Callender case established the rule in Indiana (followed in the Flum case and later decisions) that evidence obtained under a search warrant illegally issued was inadmissible. The respondent's designations "mistake in the search warrant" and "defective search warrant," were inaccurate, but not so grossly inaccurate as to indicate, on the part of the layman who was reporting the decision, a malicious motive. It must be admitted that the court in the Callender case adopted for Indiana a rule of law that is in effect in only a small minority of the states of the Union and contrary to the rule of at least thirty-four of the states. See note 1, dissenting opinion, *Wallace* v. *State* (1927), 199 Ind. 317, 157 N. E. 657. The rule which was adopted in Indiana has often been freely criticized by courts and legal writers as well as by laymen, but never before to my knowledge has such criticism resulted in contempt proceedings.

The Attorney-General says the decision of the Callender case was incorrectly stated by the respondent who stated that its effect was to turn Callender free, and that what was decided was that "the defendant should be

tried again in accordance with the law and the Constitution." The mandate of the court was:

> "The judgment is reversed, with instructions to the trial court to sustain appellant's motion for a new trial and for *further proceedings not inconsistent with this opinion.*"

Anyone who can read and understand must know that any "*further proceedings* not inconsistent with this opinion" would result in "turning the defendant free."

It may be noted in passing that while the court in the Callender case, p. 96, in declaring the search warrant to be insufficient, says that the appellant "sets forth evidence from the record to show that the alleged search warrant was signed by the chief of police and that no affidavit had been filed before an officer authorized to issue a search warrant," the record and the appellant's brief both show that the following testimony was given by the captain of police who made the arrest:

> Mr. Jay (attorney for Callender): "I will ask a preliminary question, if the court please.
> "Q. Did you have a search warrant when you went down there? A. Yes.
> "Q. From whom did you get it? A. Chief Manning.
> . . .
> "Q. By whom was your search warrant signed? A. The chief of police, Mr. Manning.
> . . .
> "Q. What premises were directed to be searched? A. Edward Callender's.
> "Q. Any description in the warrant? A. I don't remember; there most always is.
> . . .
> "The court: Just a minute, captain, you understand when Mr. Jay says the chief's name was signed at the bottom of the warrant, do you mean

to say that the chief gives the search warrant, or have you in mind the affidavit on which the search warrant was based? A. I had the affidavit in mind.

. . .

"Q. What, if anything, captain do you know whether or not the search warrant was issued from the city court. A. I think it was.

"The court: Do you understand that an affidavit is a search warrant? A. No, sir.

. . .

"Q. Was the warrant that was placed in your hands for searching the premises of Mr. Callender, signed by the chief of police or by the judge of the city court of the city of Elkhart? A. It would be signed by the judge of the city court."

The charge of splitting judicial hairs is a very common one. There has been a great deal of discussion for many years about decisions by courts of cases not upon their merits but upon technical or hair-splitting questions. A reference to the reports of many different courts will convince any impartial investigator that such cases exist. I am of the opinion that the ablest lawyers of our state, as well as the people at large, believe that technical and hair-splitting decisions should be avoided whenever legally possible and that brushing aside those purely technical questions often results in substantial justice being accomplished which would otherwise be defeated. Not only is this my belief, but it is the law, as is shown by the following statutes:

"*Judgment not reversed for technical errors in the pleadings or proceedings.*—The court must, in every stage of the action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment can be reversed or affected by reason of such error or defect." §426 Burns 1926.

"*Defect in form, etc., no ground for reversal.*—No

judgment shall be stayed or reversed, in whole or in part, by the Supreme Court, for any defect in form, variance or imperfection contained in the record, pleadings, process, entries, returns, or other proceedings therein, which by law, might be amended by the court below, but such defects shall be deemed to be amended in the Supreme Court; nor shall any judgment be stayed or reversed, in whole or in part, where it shall appear to the court that the merits of the cause have been fairly tried and determined in the court below." §725 Burns 1926.

*"When not to be quashed.*—No indictment or affidavit shall be deemed invalid, nor shall the same be set aside or quashed, nor shall the trial, judgment or other proceeding be stayed, arrested or in any manner affected for any of the following defects: . . .

"Tenth.—For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits." §2225 Burns 1926.

*"Technical errors disregarded.*—In consideration of the questions which are presented upon an appeal, the court shall not regard technical errors or defects, or exceptions to any decision or action of the trial court which did not, in the opinion of the court to which the appeal is taken, prejudice the substantial rights of the defendant." §2394 Burns 1926.

The criticism by the respondent of hair-splitting decisions is not nearly so severe or caustic as has been heard even at bar association meetings.

VI. "In the case of the *United States* v. *Borkowski*, 268 Fed. 408, it is held that where officers smelled raisins cooking and saw a light in the cellar of a house and persons there moving around and their experience told them that the odor of boiling raisins meant that a crime was being committed, they had a right to enter and seize the utensils employed, and that as an officer may arrest when he actually sees the commission of a misdemeanor, he may do the same if the sense of smell informs him that the crime is being committed. In the case of *Adonia*.

v. *State*, appealed from Vigo county, our court takes the opposite view. *In this case, the officers distinctly smelled mash cooking in a small house. They entered, found a still and arrested the owner. The court reversed the case, holding that the officers had no right to enter the house without a search warrant.*

The case referred to is *Dumas* v. *State* (1925), 197 Ind. 123, 150 N. E. 24. The Attorney-General, in the present case, after giving his view of what is "a true report" of the Dumas case, says that the respondents herein:

"Falsely represent the decision as resting on the same kind of facts as those in the case of *United States* v. *Borkowski* (1920), 268 Fed. 408 . . . and they falsely state that this court in the said case of *Dumas* v. *State* took the opposite view to that taken in the federal case and falsely state that the said case of *Dumas* v. *State* holds opposite to the decisions of the Supreme Court of the United States on the question of the lawfulness of the search of a private dwelling without a search warrant."

An examination of the text of the Borkowski case and the record in the Dumas case clearly shows that the facts were similar and that the Indiana Supreme Court did take a different view of the application of legal principles to those facts, from the view taken by the United States Supreme Court.

The following is quoted from *United States* v. *Borkowski* (1920), 268 Fed. 408, at page 412:

"A warrant had been issued for the search of a nearby house. While engaged in the search, the officers smelled raisins in the process of cooking somewhere. They saw a light in the cellar of a house, perhaps two or three doors away. Persons could be seen there moving around. The officers went to such a house and, entering the cellar, found a still in operation. They discovered the defendants in the commission of an act of a criminal character, a felony, and, having declared their purpose to search

the premises, proceeded to do so. . . . The fact is admitted that raisins were cooking on a stove in that cellar, that a still was in fact in operation, that raisin whisky and mash were found, and that the articles used in making the whisky and in the process of distillation were seized.

"The rule, state and federal, is that officers may arrest those who break the peace or commit crimes in their presence. . . . If an officer may arrest when he actually sees the commission of a misdemeanor or a felony, why may he not do the same, if the sense of smell informs him that a crime is being committed? Sight is but one of the senses, and an officer may be so trained that the sense of smell is as unerring as the sense of sight. These officers have said that there is that in the odor of boiling raisins which through their experience told them that a crime in violation of the revenue law was in progress. That they were so skilled that they could thus detect through the sense of smell is not controverted. I see no reason why the power to arrest may not exist, if the act of commission appeals to the sense of smell as well as to that of sight.

"The conclusion reached is that the officers properly arrested the defendants, and properly seized the utensils that were employed in the commission of the crime."

The record in the Dumas case included the following testimony, which supported the conviction of the defendant therein, which conviction was reversed by this court:

"*Arthur Clark* . . . direct examination . . . by Mr. Noble J. Johnson."

. . .

"Q. What is your business or profession? A. Deputy Sheriff. . . .

"Q. Was anyone with you? A. . . . Will Hays, the Federal Prohibition Enforcement Agent . . . Sheriff Armstrong, Federal officers Crowe and Horner. . . . A. . . . I seen tracks leading to

the South . ... we took a walk down this road of wagon tracks.

"Q. When you walked down that way a distance, did you come to a road or lane? A. Yes, sir, it's a lane.

"Q. Now when you got there did you smell any odor? A. Yes, sir.

"Q. What was that odor? A. It was mash, I guess—or cooking—I don't know which it was. It's an odor you smell around places where they are making mule. . . .

"Q. Just what did you do? A. We walked up toward the house.

"Q. What direction did you walk with reference to the odor? A. We just followed right down south.

"Q. Would that be the direction the odor was coming from? A. Yes.

"Q. Now as you approached the house you speak of, was that the defendant's house—Dumas', where he was? A. He was standing there, yes, sir.

"Q. Tell the court whether or not this odor became stronger as you came nearer to Dumas' home? A. Yes, after you got close to the house it got rather strong.

"Q. Now when you got to the house who, if anyone, did you see there? A. Mr. Dumas was standing in the door.

"Q. That is this defendant? A. Yes, sir.

"Q. Was the door open or closed. A. It was open.

"Q. Was there anything said to Mr. Dumas, or by Mr. Dumas, at that time? A. He said something about wanting to know if we had a warrant, I believe. I told him I was deputy sheriff; and you could look right through the door and see the still in there.

"Q. You could look and see it from where you were standing? A. Yes, sir.

"Q. And did you enter the place? A. I did.

"Q. And tell the court what, if anything, you found? A. I stepped inside and the first thing I

did,—a shotgun was standing in the corner; I broke it and threw the shells out.

"Q. Was this shotgun loaded? A. Yes, sir.

"Q. What did you find in the way of a still, or anything connected with it? A. Why, they had a still in there—a good-sized still and several barrels of mash and everything that goes with an outfit of that kind—an oil stove.—Defendant moves to strike out 'And everything that goes with an outfit of that kind,' motion sustained.

"Q. Just tell what it was. A. A still; mash and stove.

"Q. Do you recall about the mash? A. I can't recall just the number of barrels.

"Q. Was it in barrels? A. Yes, sir.

"Q. And did you find any white mule whisky? Can you tell the court about it? A. I couldn't tell you the number of gallons.

"Q. This still—was it in operation? A. It was.

"Q. Tell the court, if you can, whether or not mule whisky was coming out of it? A. It was.

"Q. And I believe you say there was a burner there—oil burner? A. Several of them.

"Q. How many, if you recall? A. There were eighteen or twenty—something like that.

"Q. Were they burning? A. Yes, sir.

Cross examination . . . by Judge J. T. Walker.

. .

"Q. You didn't on this occasion have any search warrant on which appeared the name of the defendant Dumas? A. Not as I know of.

"Q. And you didn't have any search warrant which described the premises where he lived, did you? A. I did not.

"Q. You didn't see any or hear any? A. No.

"Q. And how did you enter—east, west, north or south? A. It's the north.

"Q. And which side of the house was the door on that you went to? A. The north side.

"Q. And how far were you from the house—how far north of the house were you when you first

smelled liquor, or these odors? A. It must have been 100 yards—between 100 and 200; it may have been further than that. I couldn't say exactly.

. . .

Re-direct examination. . . .

"Q. Now, Mr. Clark, when you got to the door of this house you could look right in and see the still, is that correct? A. It is."

The comment contained in the respondent's report which is made the basis of this proceeding merely stated briefly (perhaps too briefly) what the decisions of the courts had been in these two cases. No criticism was made of the decision in the Dumas case, although from what I have just quoted from the record in that case and from *United States* v. *Borkowski, supra*, and in view of the authorities I will presently cite, it can readily be seen that the decision in the Dumas case is subject to severe criticism by those who believe that the generally-accepted rule of law theretofore prevailing should have been followed.

It appeared from the evidence in the Dumas case that the sense of smell led the officers to the defendant's door under the positive conviction that a felony was being committed, and that when they arrived at the door both the sense of smell and the sense of sight revealed to them the violation of the law. If the officers actually saw the law being violated, or from their senses of smelling or seeing, or of the two senses combined, knew that a felony was being committed in their presence, no search warrant was necessary for them to enter and make the arrest, and seize the still and the liquor. Under such circumstances they not only had the right under the law but it was their duty under the law to arrest Dumas and confiscate his still. A peace officer who is authorized by the statute to "arrest and detain any person found violating any law of this state until a legal warrant can

be obtained," §2176 Burns 1926, may arrest without a warrant when he has reasonable and probable cause for believing a felony is being or has been committed by the person arrested. *Doering* v. *State* (1874), 49 Ind. 56, 19 Am. Rep. 669; *Harness* v. *State* (1902), 159 Ind. 286, 64 N. E. 875; *Thomas* v. *State* (1925), 196 Ind. 234, 146 N. E. 850; *Murphy* v. *State* (1926), 197 Ind. 360, 151 N. E. 97. And a seizure is authorized, regardless of whether the officer is acting under a warrant where a violation of the liquor law occurs in his presence. 33 C. J. 680; *State* v. *Mullen* (1922), 63 Mont. 50, 207 Pac. 634; *Salt Lake City* v. *Might* (1922), 60 Utah 108, 205 Pac. 900; *State* v. *Watson* (1923), 133 Miss. 800, 98 So. 241; *Kennedy* v. *State* (1925), 139 Miss. 579, 104 So. 449; *State* v. *Pauley* (1922), 49 N. D. 488, 192 N. W. 91.

This court has repeatedly held that intoxicating liquor may be identified as such by the smell of the same. *Dillon* v. *State* (1919), 188 Ind. 603, 125 N. E. 37; *Zoller* v. *State* (1920), 189 Ind. 114, 126 N. E. 1; *Shelton* v. *State* (1921), 191 Ind. 228, 132 N. E. 594; *Stankiewoecz* v. *State* (1924), 194 Ind. 246, 142 N. E. 615; *Dilly* v. *State* (1927), 199 Ind. 158, 154 N. E. 865. And, by similar reasoning, the odor of cooking mash identifies the operation of the well-known still used in the unlawful manufacture of intoxicating liquor, as was held in the Borkowski case.

Judge Myers, speaking for this court, in the Dumas case, page 127, said: "There is some conflict in the testimony of the officers as to whether or not the still could be seen from the open outside door."

This court in a case at law does not weigh conflicting oral testimony, and since there was evidence to support the judgment on the theory of a lawful arrest made after the officers learned by their senses of sight and smell that a felony was being committed in their presence, it would appear to me that the Dumas case was erroneously de-

cided, and mere comment thereon, which did not even directly criticise the decision, should not be held to be contemptuous.

VII. *"A few months ago Judge Willoughby wrote an obiter opinion in the Batts case where he practically held that an automobile cannot be searched without a search warrant. He also made the statement in his opinion that the vessels which had been thrown out of the car in the Batts case smelled as if there might have been whisky in them, when as a matter of fact the uncontradicted evidence showed that these vessels contained twenty-three gallons of white mule."*

This quotation is not contained in the superintendent's report but was printed almost three years ago in the Indiana edition, the American Issue (October 18, 1924). The case referred to is *Batts* v. *State* (1924), 194 Ind. 609, 144 N. E. 23. The first sentence of the quotation is not a complete statement of the law, because an automobile may also be searched under other circumstances, for example when its operator has been previously placed under lawful arrest, but this omission in the statement does not seem to me to constitute contempt. The criticism of the court is contained in the second sentence. That portion of the court's opinion in the Batts case which is referred to in the second sentence of the above quotation is as follows:

*"There was some evidence that Mr. Batts, after his car was shot up, threw something out. Some witnesses for the state testified that they went to the place and found some wooden kegs and jugs that smelled like they had whisky in them."*

An inspection of the record in the Batts case, or of the briefs of counsel, which contain practically a complete resume of the evidence, is necessary to determine the truth or falsity of respondent's statement that *"as a matter of fact the uncontradicted evidence showed that these*

*vessels contained twenty-three gallons of white mule.*" The verbatim testimony of all the witnesses who testified regarding the contents of the vessels is as follows:

Ralph Donahue, deputy sheriff, testified: "I saw Mr. Batts with a keg in his hands throw it into the bushes; they (Mr. and Mrs. Batts) were both out (of the automobile) at the time."

"Q. Did you at any time examine the contents of the keg that you say you saw Batts throwing from the car? A. Yes, that was examined.

"Q. What did it contain? A. It contained what is commonly called white mule whisky.

"Q. Were there any other containers or vessels of any kind there at that particular spot? A. Yes.

"Q. What were they? A. Some two or three stone jugs and as I recall there was five wooden kegs.

"Q. How many gallons of what you say was white mule whisky was there? A. As I remember there was 23 gallon."

Carl Prigg, farmer, testified: "They had pulled out at the side of the road and were throwing something out in the bushes, in the ditch."

"Q. You mean the defendants George Batts and Stella Batts? A. Yes, sir.

"Q. Were both throwing something out? A. Yes, sir.

"Q. How many trips did they make from the car to the ditch? A. It looked to me like several.
. . .

"Q. Did you find out what the things were that were thrown out of the car by Batts and Batts after you reached the place? A. Yes.

"Q. What were the things you seen thrown out? A. Some four or five wooden kegs and two stone jugs.

"Q. Did you open or assist in opening, or see them after they had been opened, at that time? A. I saw one jug empty on the road.

"Q. What did it contain? A. Well, it smelled like white mule whisky."

Leslie Sears, Sheriff of Putnam County: "I just told them they were under arrest and told them to get in the car; we loaded up my car and went up to where these kegs had been thrown.

"Q. You say you went back and got these kegs? Was that the spot you seen the defendants stopped the first time? A. Yes, sir.

"Q. When you got back there what did you find? A. Found six wooden kegs and two gallon stone jars.

"Q. Did you examine those kegs and jugs at the time? A. Yes, sir.

"Q. What did they contain? A. White mule whisky.

. . . .

"Q. I will ask you if you ever seen this keg before? A. That is a keg we picked up there on the Ocean to Ocean highway from the Batts' car.

"Q. What does this keg contain, if you know the contents of it? A. White mule whisky is all I can tell you.

"Q. Have you tested the contents of that keg? A. I seen it tested.

"Q. What was it tested by? A. Government hydrometer.

. . .

"Q. What is the test by government hydrometer of the contents of this keg? A. Forty-nine per cent. alcohol."

John Harmon, night policeman, testified: "The next time I saw them (defendants) they were getting in the car at the bend above the bridge.

"Q. What were they doing at that time, if anything? A. They were just getting in the car when I saw them.

"Q. What did you do and Mr. Sears? A. He rode around to where this car was stopped; I got out and Mr. Sears went on.

"Q. Did you find anything there? A. Yes, sir.

"Q. What did you find where the car was stopped? A. I found I believe it was six small kegs and two jugs.

"Q. Where were these six small kegs and two jugs? A. Just at the right of the road.

"Q. Did you open them at that time, any of them? A. I opened a jug and a keg.

"Q. What did those jugs and keg contain? A. What is called white whisky.

"Q. Is that white mule whisky? A. Yes, sir."

Mr. and Mrs. Batts contended that they did not throw the jugs out of their machine and disclaimed any knowledge of them, so that the respondents statement that "the uncontradicted evidence showed that these vessels contained twenty-three gallons of white mule" is a much more accurate statement of the record than was contained in the opinion of the court. However, the controversy over the quantity of whisky was not an important factor in the Batts case because the court's decision was that *any* evidence was inadmissible for the reason that it was procured by a search and seizure without a search warrant.

It seems to me, although the evidence on which Mrs. Batts' conviction was based may not have been obtained by proper means, that the question of a search and seizure without a warrant was not properly involved. The officers saw the whisky being unloaded from the Batts' automobile at the side of the road and on that testimony and not on the result of any search of the Batts' persons or automobile, was the judgment of both the trial courts based, assessing a fine and imprisonment against Mrs. Batts for transporting liquor.

*Not guilty of contempt because criticism was of decided or disposed of cases.*

The criticism or comment of respondents, which is objected to, concerned the decision of cases which had

been disposed of *several years before the criticism was published.*

The rule, which has always heretofore prevailed in Indiana, is that actionable contempt does not occur where the publication or criticism relates wholly to cases previously decided and no longer pending in any form before the court. "Comments, however stringent, which have relation to proceedings which are past and ended, are not in contempt of the authority of the court to which reference is made." *Cheadle* v. *State* (1886), 110 Ind. 301, 310, 11 N. E. 426, 431. In *Zuver* v. *State* (1918), 188 Ind. 60, 121 N. E. 828, it was said:

> "Appellant asserts under oath that the proceeding referred to in the published article was not pending before the court at the time said publication was made, but that it had been fully and finally decided and determined before that time. If this statement is true, the publication of the article would not constitute a contempt of court even though it may have been inaccurate or false and may have been prompted by improper or malicious motives."

The case of *Patterson* v. *Colorado* (1907), 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689, quoted from at length in the prevailing opinion, unqualifiedly states that "when a case is finished, courts are subject to the same criticism as other people." "It is generally held that after the final disposition of the case the press and the public have the right to freely discuss, criticize, and censure the decisions of the courts," 13 C. J. 37, citing cases in the United States Supreme Court and in Colorado, Illinois, Indiana, Iowa, Louisiana, Minnesota, Montana, Nebraska, New York, Ohio, Oregon, South Dakota, Texas, Washington, Wisconsin, England and Canada.

Under the English common law, criticism of a judicial officer even though made after the termination of the

cause was contempt. This rule in cases where the court was "scandalized" has been applied, although not in recent years, in Arkansas, Georgia, Michigan, Missouri, Vermont and Virginia. Cases in this small and obsolete group, viz., *State, ex inf.,* v. *Shepherd* (1903), 177 Mo. 205, 76 S. W. 79, 99 Am. St. 624; *In re Fite* (1912), 11 Ga. App. 665, 76 S. E. 397, are cited and followed by the court in the present case. Even in the courts of England committals for such contempts became obsolete almost thirty years ago, except in small colonies consisting principally of colored populations. *McLeod* v. *St. Aubyn* (1899), L. R. (A. C.) 549.

The majority opinion in changing the long-settled rule of our court and adopting this old discarded rule does so upon the authority of these few cases, in each of which the published article was defamatory, impugned the motives of the court, and charged it with corruption—cases which I do not believe are parallel to the one at bar.

Among these cases holding that a publication which "scandalized" the court need not relate to a pending cause, to which this court (disregarding the Indiana cases I have cited) has turned for authority is the case of *State* v. *Shepherd* (1903), 177 Mo. 205, 76 S. W. 79, 99 Am. St. 624. (As already stated I do not think the publication here can be held to have "scandalized" the court.) The Shepherd case is doubtful authority and its decision was the reason for the writing twenty-three years ago of the text book "The Law of Constructive Contempt," by John L. Thomas, an ex-judge of the Missouri Supreme Court, wherein he clearly pointed out the errors of that famous case. After reviewing the more recent cases, a modern text (6 R. C. L. 513) says of the judges holding to the position announced in *Shepherd* v. *State, supra,* that they "must impliedly if not expressly regard themselves as entitled by reason of their high offices to a privilege that does not attach to

citizens generally—a most dangerous supposition; and they confuse their private rights (all of which remain to them) with the greater aims of society in allowing and upholding the right to punish for contempt. Besides, when a judge uses his office and the extraordinary power it gives him to vindicate a wrong, there is danger of running into greater excesses and abuses of power than those which he may desire thus to punish. Therefore, while it may be true, as one of the courts said, that 'where vituperation begins, the liberty of the press ends,' it may also be true that where the liberty of the press and freedom of public comment ends, there tyranny begins."

In *State, ex rel.*, v. *Circuit Court, supra*, the court in discussing the cases that hold that adverse newspaper comments upon acts of a court in actions already past and ended may be held contemptuous said:

"The reasoning upon which such decisions rest is that such publications tend to diminish the respect due to the court in the trial of future causes, and thus impair its usefulness. This doctrine is certainly extreme. Carried to its ultimate conclusion, it would call for the punishment of any adverse criticism on the official conduct of a sitting judge, and absolutely prevent all public or private discussion of court proceedings. All such discussions, if unfavorable to the ability or honesty of a judge, must tend in some small degree, at least, to undermine public confidence in the court in the future. On the other hand, many well-considered cases may be found in which it is distinctly held that such publications do not constitute contempt, and cannot be punished as such. . . . Some of the cases, . . . distinctly hold that under our form of government such publications do not constitute contempt, and that to punish them as such would be a serious invasion of the great constitutional guaranties of freedom of speech and of the press. . . . Important as it is that courts should perform their grave public

duties unimpeded and unprejudiced by illegitimate influences, there are other rights guaranteed to all citizens by our Constitution and form of government, either expressly or impliedly, which are fully as important, and which must be guarded with an equally jealous care. These rights are the right of free speech and of free publication of the citizen's sentiments on all subjects."

The majority opinion also seems to make the point, although it does not do so clearly, that because there were, at the time of the publication of respondent's criticism, other cases pending in this court in which were involved legal questions similar to the questions decided in the criticised cases, the court could therefore proceed as though the criticism was of pending cases. No case has been cited in support of such a theory, and on principle I do not believe it to be sound.

In respondent's verified answer he denied that he had any knowledge that any cases were pending in which the legal questions under consideration in his report were involved, *and that he believed since the court was committed to the view announced in the decision under discussion, the question was no longer an open one in any of the courts of Indiana.* This seems to be a reasonable answer in view of the fact that the cases had been decided several years prior thereto.

If the fact that there are liquor cases involving the legality of searches pending before the court is reason for the suppression of adverse comment on decisions rendered, the result of the court's decision herein may be to prevent *all* criticism in the future—for as long as prohibition laws exist, I predict there will be prosecutions under them involving similar legal questions.

The charge here is one of *indirect criminal contempt.*

"No one ought to be found guilty upon a doubtful charge of indirect contempt, and especially so in

a case in any manner involving the freedom of the press." *Cheadle* v. *State, supra.*

"It is clearly not sufficient for the prosecuting attorney or other informant merely to characterize the published article as in contempt of court. . . . The informant is required to exhibit a class of facts that will, of themselves, from an ordinary meaning, establish the contempt." *Rucker* v. *State* (1908), 170 Ind. 635, 85 N. E. 356.

I do not believe that such a class of *facts* has been exhibited here. Many *conclusions* were alleged, but they have all been denied. While certain statements in respondent's report of the decisions in question are, as I have pointed out, inaccurate, when viewed by one trained in the law, yet considering the review of these cases hereinbefore made I am convinced that the majority of the court are in error in stating that:

"The author of the report . . . by apparent studied efforts to delude readers of the report into a false impression of the court's attitude in such cases, garbled, falsified and misrepresented the facts thereof and the law therein declared."

I do not believe that the language used is libelous, contemptuous, false, and malicious *per se*, or that it imputes lack of integrity to the court or any of the judges, or was such as would intimidate or tend to intimidate the court. It is only where the article is contemptuous *per se* that one cannot purge himself by a verified response. *But if the respondent was guilty of contempt I believe he has purged himself by his several responses and answers filed under oath with the court.*

In an indirect contempt case the sworn denial of any fact charged must be taken as true, and if the denial is false the remedy is by a prosecution for perjury.

"When a defendant undertakes to purge himself by a verified answer filed in a proceeding for indirect contempt of a criminal nature, the facts stated

therein must, in such proceeding, be treated as verity. If the facts so stated under oath are sufficient to show that no contempt was committed, the defendant must be discharged." *Zuver* v. *State* (1918), 188 Ind. 60, 121 N. E. 828.

"If the defendant appear and make a sworn statement that the matters in the affidavit are not true and allege a state of facts consistent with his innocence, and avows that there was no intention to interfere . . . with the processes of the court, he should be discharged." *Burke* v. *State* (1874), 47 Ind. 528. (Syllabus.)

The separate response and answer of each of the respondents to the amended information cover nine typewritten pages and the second and additional paragraph of response and answer of the respondent Edward S. Shumaker covers fourteen typewritten pages. If written words are capable of purging a respondent of contempt, these respondents have purged themselves, for they have completely and categorically covered every allegation of the Attorney-General's information, have shown that such of said allegations as are true do not constitute contempt of court and have denied, explained, or confessed and avoided every charge that has been made against them. Lack of time prevents the preparation of a complete condensed resume of these responses and answers.

This is a most unusual proceeding. The information filed by the Attorney-General does not appear to have been filed either with the consent or knowledge of the court, as would ordinarily be the case where the court sought to protect its dignity or honor by a contempt proceeding. Neither does the information appear to have been filed at the request or instance of any person accused in any of the cases of violating the liquor laws pending in this court. The Attorney-General, however, inferentially champions the cause of such appellants and contends that respondents by criticism of decided cases

have attempted to prejudice the court against their pending causes, but he has not confessed error in any of such cases and he has proceeded to brief them all and insist upon convictions for all such appellants. So long as he maintains they are guilty and should be convicted he should not be heard in *their* behalf to object to criticism of decided cases.

No two cases are ever exactly alike and rarely have exactly the same questions involved. The fact that pending cases may have questions of law involved similar to those decided cases which have been the subject of comment should not serve to change established legal principles, and thus render criticism of a disposed-of case contempt in a pending case.

> "There is a growing reluctance in the courts to resort to an exercise of the power to punish for contempt except where absolutely necessary to the fair and orderly administration of justice, and an inclination, evidenced in some jurisdictions by their statutes, to do away with the old severities, which arose out of an exaggerated regard for the dignity of form rather than for the essence of justice." 6 R. C. L. 488.

Supreme Courts are neither honored nor helped by being held up as above criticism. Constructive criticism of judicial decisions, whether it be professional or lay, is to be desired rather than to be stifled. The time when men, whether kings or judges, could be considered incapable of doing wrong is buried in the historic past. I do not believe it can be said in the present case that punishment is absolutely necessary to the fair and orderly administration of justice, but on the contrary, I believe that such administration requires the respondents' discharge.

It is unfortunate that in a proceeding of this kind the judges whose decisions are criticised sit in judgment of the person who has made the criticism. The practice

in this respect is different in many countries. In some states, and even in England where the practice originated, there has been much criticism of it. Lord Erskine, at the close of his great career, gave it as his opinion that there ought to be a jury trial when a person is charged with libeling a court or judge, and Lord Campbell, one of the Chief Justices of England in a note to the case of *Rex* v. *Almonds*, Wilm. Op. 243, third volume of his "Lives of the Lord Chief Justices" 190, says:

> "In consequence of the resignation of Sir Fletcher Norton, who as attorney-general had made the motion, it (the Almond case for contempt) was dropped, after cause shown, while the court was considering its judgment; and although there can be no doubt as to the power to proceed by attachment in such a case—if a prosecution for a libel on judges be necessary, the preferable course is to proceed by information or indictment, so as to avoid placing them in the invidious situation of deciding where they may be supposed to be parties."

In *Storey* v. *People, supra*, the court, quoting from *Stuart* v. *People* (1842), 4 Ill. 395, 406, said:

> "If a judge be libeled by the public press, he and his assailant should be placed on equal grounds and their common arbiter should be a jury of the country."

The case last cited contains some interesting comments on constructive contempts and, with reference to the old common-law rule of the British courts, says:

> "Such portions only of the common law as are applicable to our institutions, and suited to the genius of our people, can be regarded as in force. It has been modified by the prevalence of free principles, and the general improvements of society, and whilst we admire it as a system, having no blind devotion for its errors and defects, we cannot but hope, that in the progress of time, it will receive many

more improvements, and be relieved from most of its blemishes. Constitutional provisions are much safer guaranties for civil liberty and personal rights, than those of the common law, however much they may be said to protect them."

It may have been a reluctance on the part of the judges of this court to determine alone whether these respondents were guilty of contempt in criticizing their own opinions that prompted them to appoint the *amici curiae* referred to in this opinion. The *amici curiae* were not agreed upon the disposition to be made of the case, a minority report by the Hon. C. C. Shirley recommending to the court that each of the defendants be discharged.

The court has made reference to excerpts from public addresses of Roscoe Pound, Justice David J. Brewer, and Felix Frankfurter, the latter two being contained in the book, "The State of the Nation," written by that great American statesman and author, my friend for many years, former Senator Albert J. Beveridge, now dead, but never dead for me. While I believe the court is right in its statement that "these men . . . certainly did not intend to be understood as saying that courts have no protection against pernicious and libelous attacks which tend to endanger the rights of parties in pending cases or that will prevent a calm and dispassionate discussion and investigation of such causes, . . . or in short tend to impede or defeat the due administration of justice," I also believe that the present case is not one in which pernicious and libelous attacks have been made which tend to endanger the rights of parties in pending cases, prevent discussion and defeat due administration of justice, but is one in which the kind of criticism was made of the court's decisions that was referred to by Brewer, Frankfurter and Pound.

Prefacing the Brewer quotation, Senator Beveridge said:

"Criticism of any mundane thing is all right—perfectly natural, in fact wholesome—and courts are not exempt from that normal functioning of the alert and healthy human intellect. That is the way Abraham Lincoln looked at it.

"One of the ablest and most learned—yes and most 'conservative'—justices that ever sat upon our National Supreme Bench, David Josiah Brewer, thus described the true and helpful state of mind toward the Supreme Court itself." (Here follows the portion quoted in the prevailing opinion.)

Following this, Senator Beveridge says:

" . . . The gentle reference to bad taste in some critics and criticism was applied to those who were assailing the Supreme Court at the time Justice Brewer delivered his oration. Rather liberal minded, was it not, for a 'judicial autocrat?' "

Following the Frankfurter quotation, Mr. Beveridge said:

"So the complaint about the judiciary and criticism of the Constitution which we hear today are not wicked; *and merely to pour vituperation upon the critics only feeds the fires of discontent.* The sole question for just minds to consider is: What is the best thing to do about it if anything at all should be done about it?"

The portion of the quotation from the remarks of Roscoe Pound which the court referred to but did not quote is as follows:

"While an administrative officer can run up and down the land defending his conduct and can be interviewed in the newspapers with reference to his administrative actions, a judge is supposed, in the language of Mr. Dooley, to comport himself with 'gintlemanly resthraint.' "

The majority opinion refers to the fact that Justice Brewer was an Associate Justice of the Supreme Court of the United States at the time a case from which it quotes at length, *Patterson* v. *Colorado, supra,* was decided, but an examination of the report of that case shows that Justice Brewer filed a dissenting opinion in which he said:

"The plaintiff in error made a distinct claim that he was denied that which he asserted to be a right guaranteed by the Federal Constitution. His claim cannot be regarded as a frivolous one. . . ."

The court there did not consider that the decision which was criticized was a final determination of the case, but as I have already pointed out, stated that where a case is finished it is open to criticism without liability for contempt. In *Patterson* v. *Colorado, supra,* the court said, in discussing the articles which constituted the contempt and the answer filed, "That they are far from showing that innocent conduct has been laid hold of as an arbitrary pretense for an arbitrary punishment," thus clearly distinguishing that case from the one at bar where the answer of the respondent, divesting the verbose and speculative information of its inaccurate conclusions, shows his conduct not to have been contemptuous.

Statements in both news and editorial columns, more critical of the decisions and work of this court than the American Issue articles, have recently appeared in the public press, yet this court, upon having the suggestion made to it, did not view with approval the institution of contempt proceedings against the persons who made the statements or the papers which printed the following articles and editorials:

"Refund tax decision of the Indiana Supreme Court was attacked from two quarters Thursday

. . . Philip Zoercher pleaded 'This decision is the only one in the history of Indiana courts that permits relief before injury has been shown. It is unjust and unfair and based on a mere technicality.' . . . Chairman John J. Brown elaborated on his charge that it was 'the veriest sort of a bad guess.' . . . He says: 'Regardless as to who is right regarding whether or not proper notice was given, revenues of the State of Indiana which provide the means of government are too sacred to the welfare of the people to permit *technical notions of lawyers or judges* to interfere with the processes of government. . . . The time is here and now for the employment of at least some degree of good old fashioned common horse sense in handling matters of this character, regardless of the appeals of unscrupulous lawyers who are prompted only by a desire to filch and loot the public treasury for their personal gain, at the expense of the tax payers.'" From the Indianapolis Times, July 22, 1927.

"One more of the ancient bulwarks slipped away apparently when the Supreme Court decided that the members of the Legislature will draw $10 a day instead of six as salaries for the session just closed. . . . Two members of the Supreme Court say that the action was against the constitution and that these members who voted an increase of salaries are no more entitled to the money than they would be had they taken a jimmy and a gun and walked away with it from the treasurer's office.

"'What is the Constitution between friends?' was the cynical comment of a very shrewd politician of this state.

"The Supreme Court gives the answer." Editorial Indianapolis Times, April ——, 1927.

"The decision of the court—its decision was by the narrowest margin—is certainly surprising, to use a respectful adjective. . . . Even great jurists and publicists sometimes take queer shoots in their reasoning. Not often has there been a stranger aberration than that shown in this case. . . . *There*

*certainly ought to be a rehearing, if for no other reason than to give the Supreme Court a chance to redeem itself from a very silly blunder."* Editorial in Indianapolis News, April 20, 1927.

"The Supreme Court should, we think, be glad of the chance which Mr. Gilliom has given it, to correct its very serious blunder. . . . We trust that the court will give this case a rehearing—if a rehearing shall, *as it should be, granted*—the serious and careful consideration which its grave importance demands." Editorial, Indianapolis News, April ——, 1927.

"These are perilous days for the Constitution and it is somewhat refreshing to find, occasionally, a voice raised in its defense.

"In no other way could that declaration of Attorney General Arthur L. Gilliom to the Supreme Court in his opposition to the self-raising salary law of the last Legislature be construed.

"It must have taken considerable courage to tell the Supreme Court that: 'What appellant (and this means the legislators who raised their own salaries from $6 to $10 a day) obviously sought to do was by that means to remind the court that the seventy-fifth session increased the salaries of the judges of the Supreme Court, who are now to decide this case, from $7,500 to $10,000 per year. No such increases to the Governor, to the Attorney General, or to the judges of the Supreme Court afford any legal or proper reason for sustaining the increase which the members of the Legislature provided unto themselves. *The Constitution cannot be thus bartered away.'*

" '*It is not a question of policy or reciprocation here.* It is a question of power under the Constitution.'

"The inferences and implications are very plain. They are, in fact, so plain and evident that the judges cannot help but notice them. . . ." Editorial, Indianapolis Times, May 19, 1927.

"Apparently the Supreme Court of this state finds it as difficult as the ordinary citizen to decide just what is law and what is not.

"From the day of Blackstone we have been led to believe that law is so exact in its logic and its fundamental principles that no one can be misled.

"The judges of the Supreme Court, coming back from their vacations for a brief session, dealing with three subjects which they believed were somewhat important, have gone back to their havens of rest and given forth no edicts or decisions.

"One of these matters deals with the right of the Legislature to raise the pay of its own members. Attorney General Gilliom, fighting against any such precedent, called attention of the judges to what he believed to have been a sad misconception of the law when they decided that the law makers, who had voted also to increase the salaries of judges, had a perfect right to dip into the treasury. That question is still held up.

"Another of these important questions had been before the court more than eighteen months. It deals with the dignity and power of the court itself.

"In the case Rev. E. E. Shumaker stands charged with contempt of court, the contempt being that he had scattered false statements concerning a decision of the court on liquor matters.

"The Attorney General said that the head of the Anti-Saloon League was making it impossible for the court to fearlessly discharge its duty in liquor cases and cited the fact that appeals were pending in some twenty liquor cases.

"In this matter the judges called six of the most prominent lawyers of the State, first carefully inquiring into their political affiliations and selecting them with an even balance between parties, to tell them whether there was contempt or not.

"It is perhaps beside the question to suggest that the judges introduced a rather strange note into jurisprudence when they announced that they picked their advisers on a political basis. It may have been expected that they would choose them for reputations for legal knowledge and courageous character. But they picked them. And these lawyers gave a

report which said that Shumaker was contemptuous.

"It might be suggested that the judges then ought not to have had any trouble in reaching a decision. But for months there has been delay. What does that suggest? Has the law ceased to be exact? Or are the judges proving that Gilliom was right when he said that courts are tyrannized?

"The other question involves D. C. Stephenson, once the most powerful political figure and perhaps the State's greatest dub in horse trades. He wants to get out on the excuse that some clerk failed to put the seal in the right spot in a document or did not put it there at all.

"That may be a very involved legal question. It may require research and study of all the decisions of the past. It may be very necessary to discover whether human liberty is at stake because of such clerical omissions as he cited.

"Meanwhile the people of the State must be left to ponder on what is law.

"Can every Legislature raise its own pay? What will the next one do? Is it safe to criticise the decisions of the Supreme Court or not? Can the acts of a clerk upset decisions of juries? Who knows?" Editorial, Indianapolis Times, July 23, 1927.

If the court is generous enough to overlook such statements or believes that truth will in the end be vindicated regardless of such improper and unjust attacks and yet imposes a sentence on the respondents here for the publication of the comparatively mild criticisms hereinbefore considered, it seems to me that the court is "straining at a gnat and swallowing a camel."

The decision of the court that the respondent Martin, as a trustee of the Anti-Saloon League, is guilty of contempt, is accomplished in the following language:

"He (Shumaker) admits editing the report under the supervision of the Headquarters-committee, but that its publication in pamphlet form and reprinted in the American Issue was pursuant to the order of

the Board of Trustees. It will be noticed that respondent Martin does not deny that he, as one of the Trustees of the League, participated in ordering the publication of the report, *as stated by Shumaker in his response.*"

It is certainly a novel procedure for the answer of one respondent or defendant to constitute the information or indictment upon which another respondent or defendant is tried. The amended information, filed by the Attorney-General, and supposedly containing the charges upon which respondents are being tried, does not charge the trustees with any contempt at all, but on the contrary alleges:

"That in truth and in fact the said report as published in said paragraph form was not so ordered published by the trustees of the Anti-Saloon League, but that the said trustees at a meeting where the said report was considered by them before its publication voted that the derogatory matters contained therein concerning this court, . . . should be deleted therefrom before the same should be published; that contrary to the said vote by said trustees and without regard thereto the above named defendants caused the same to be printed and distributed without first deleting therefrom the said matters."

In the separate response and answer of each of the respondents it is alleged:

"That said respondents, Ethan A. Miles and Jesse E. Martin did not in any manner collaborate in the preparation of said report and had nothing to do with the preparation or publication thereof, except that said respondent Jesse E. Martin is and was a trustee of the Anti-Saloon League."

It therefore appears to me that the finding against Martin is wholly unwarranted. It may be noted in this connection that the only point upon which all of the *amici curiae* appointed by the court were agreed was

that the respondents Miles and Martin were not guilty of contempt. In the brief of the majority of those "friends of the court," it was said:

> "While it would, perhaps, have been better pleading if the respondents, Miles and Martin, had filed separate answers, still, in our opinion, these two respondents, by denying they had anything to do with the preparation or publication of the article, have sufficiently purged themselves of the charge and are entitled to their discharge."

I believe that each of the respondents—Shumaker, Miles and Martin—is entitled to his discharge.

### SUPPLEMENTING FORMER OPINION.

(Filed July 20, 1928.)

MYERS, C. J.—On August 6, following the filing of the prevailing opinion in this case, respondent Shumaker appeared in open court and moved to arrest the judgment against him, which motion was overruled, and thereupon judgment was pronounced. At that time, respondent Martin was reported without the state, and further proceedings as to him were postponed until the convening of court in October following. On August 16, attorneys for respondent Martin moved for him a new trial, and, on the eighteenth, respondent Shumaker separately moved for a new trial, which motion was at that time overruled. On September 17, the state filed a motion to modify the Shumaker judgment by increasing the penalty, to which motion respondent Shumaker, on September 22, entered a special appearance and moved to strike it out. On October 7, the motion to strike was overruled. On October 5, Shumaker filed his separate petition for a rehearing. On the same day, Martin appeared in open court and, on leave of the court, was permitted to file an additional response. By this response, which was properly verified, it was made to appear that

he (Martin) did not participate as trustee of the league or otherwise in ordering the publication of the report as made by Shumaker to the board of trustees of the Anti-Saloon League, and had no part in its publicity. This supplemental response, in connection with his original response to the information filed by the Attorney-General, we hold is sufficient to purge him of the charge preferred by the state. It is therefore ordered that Jesse E. Martin go hence without day.

Hereafter, we will use the word "respondent" for the words "respondent Shumaker."

The state's motion to modify the judgment, and the petition of respondent for a rehearing are the matters before us for disposition. The motion of the state to modify because of an inadequate sentence is based upon allegations, in effect, that the respondent, while his case for contempt was pending before this court, corruptly attempted to induce citizens of great political influence and well known throughout the state for their splendid citizenship, to influence for him a favorable decision.

A motion by respondent, filed October 8, to require the state to make its motion more specific was, on October 25, overruled. On November 1, a further hearing on the pending motion by the state was fixed for November 21. On November 16, objections to the further trial and hearing on the motion of the state were filed by respondent and overruled on November 21. Thereupon, the case was submitted for trial. The state and respondent were permitted to introduce oral evidence and, at the same time, over the objections of respondent, the state read depositions.

While this proceeding may be classed as one for criminal contempt, yet by no means is it a criminal action in the sense that the rules for the admission of evidence in a criminal case apply. *Dale* v. *State* (1926), 198 Ind. 110, 121, 150 N. E. 781.

It is a remedy inherent in the courts and evidence in the form of depositions of witnesses residing in foreign jurisdictions is not objectionable. *Una* v. *Dodd* (1884), 38 N. J. Eq. 460.

From the evidence, it appears that respondent exerted considerable activity in an attempt to have the Republican State Central Committee called together for the purpose of passing a resolution condemning the Attorney-General of the state for his act in prosecuting the contempt proceeding then pending in this court. In the 1926 campaign, two United States senators and various state officers, including two members of this court, were to be elected. There was evidence well supporting an inference that if the then-pending contempt case was disposed of favorable to respondent, it would clear the atmosphere very materially as to the position he would assume and the influence he might have toward the success of the Republican state ticket.

In August, 1926, although this court was then in recess and would continue to be until October 5, respondent sought the advice of our junior senator, then a candidate for re-election on the Republican ticket. Respondent's purpose, so says the senator, was to have an early decision of his case, and, on being told by the senator that he was in the legislative department of the federal service and could not help him, some further conversation was had which resulted in calling the senior senator, who was also a candidate for re-election, and then at Lake Maxinkuckee, to the telephone and with whom respondent had a conversation with reference to this case, the substance of which, as the senator remembers it, was that respondent thought he (the senator) "ought to use your influence to get that court called together for the purpose of rendering a decision in my case, and I think that court should decide that case in my favor; it looks to me like they are going to let it

run until after the election, and after the election send me to jail or the penal farm, a thing they would not probably do before the election," and that the senator should do two things: (1) Have the Supreme Court meet and decide his case, which he thought ought to be decided in his favor; and (2) have the Republican State Committee called together to pass a resolution condemning the Attorney-General for having brought the contempt proceedings. On being told by the senator that he could not meet either of the requests, respondent replied that "the Anti-Saloon League and the Methodist Church will hold you personally responsible if that is not done." Respondent was advised to consult the Republican State Chairman on the subject of calling the committee together, as he, the senator, had no power to call them, and as to the court, "he had never attempted to influence the decision of any court" and would not attempt to do so, to which the respondent replied: "I think I am entitled to know one of two things immediately, either a decision of the court or a plain unequivocal statement from yourself and the Republican organization that you are not in sympathy with Gilliom's movements." Respondent positively denied making any such statements as above detailed, but admitted that he said in that conversation that he could not understand why the matter was going over, "and that I didn't know just what our rights were, whether we would be permitted to go ahead and make our usual statement as to the record or attitude of candidates, with this an undisposed-of case." However, another witness, Henry Lane Wilson, was present and heard the telephone conversation at the Maxinkuckee end of the line, and testified that he heard the senator say, "he had no power to call the state organization together and he would not do it if he had the power"; furthermore, "that he had never attempted to influence the decision of any

court since he had been in public life and he had no intention of beginning at this time"; also, "do you mean to say that you will use the power of the Methodist Church and the Anti-Saloon League against me unless I interfere in your behalf?"

Prior to the telephone talk, it appears that the two senatorial candidates, at Washington, D. C., had some talk relative to assisting respondent out of his trouble, and the political effect it might have if respondent was sent to jail, but neither of them thought it advisable to mention the subject to any of the personnel of this court. Finally, it was decided that each should act in the matter as to him might seem advisable. But no action, it seems, was taken by either, other than the writing of two letters by the senior senator to personal friends in Indiana requesting that they see the Attorney-General and have him consent to a mere fine in case respondent was found guilty.

There is also evidence tending to show that on a Sunday morning in September, 1926, the respondent, in the Methodist Church at LaGrange, saw the Republican State Chairman, and to him, in substance, complained about the action of the Attorney-General in bringing the contempt case against him, which would injuriously affect the Republican party and its success at the election. However, he thought if the Attorney-General "could be convinced or see the situation as he (respondent) thought was right, that it would help greatly if he would call off this contention." The trend of his conversation was that the chairman should see the Attorney-General and have him stop the controversy and have the court dispose of it before election. If this were done, it would greatly benefit the ticket as "he (respondent) would like to do what he could to help elect the ticket." Only one of the candidates for the office of judge of this court was standing for re-election

and it was his candidacy alone that respondent bitterly opposed, but thought if the Attorney-General could be made to understand that he was wrong in prosecuting the contempt case, and it could be disposed of as he thought it should be, the candidacy of the judge he was opposing would be acceptable. The witness testified that it was his understanding from his talk with the respondent that if he were "able to convince the Attorney-General it would help his (respondent's) own situation and help politically, likewise." Respondent directly denied any such conversations, and, in addition, testified "that if I said anything to him on that (candidacy of the judge), it was that no matter what the decision would be, the attitude of the league would remain unchanged."

From all the evidence in this case, the conclusion must follow that respondent evidently thought that a more favorable decision to him might be had before than after the election. In order to bring about this result, he sought certain action from those influential in the councils of the Republican party. He may not have intended that those responsible for party success should directly attempt to influence the court in his favor, but he planned to do it indirectly. Notwithstanding the inference which might well be drawn from his various activities, we are not disposed, in view of the status of this case, to modify the judgment already announced as the result of the original hearing.

Respondent has filed his petition for a rehearing, which is not materially different in its attack upon the majority opinion and finding in this case than was presented by his motion for a new trial. This case originated in this court. It was tried here, and any ruling of the court at which either party may feel aggrieved may be properly presented by a motion for a new trial.

Respondent's petition for a rehearing is denied. In

this connection, however, and with reference to his motion for a new trial, wherein he insisted that the appointment of a committee to act as *amici curiae* was error and harmful to him, it may be said that this insistence seems exceedingly inconsistent with his statements prior to the trial, in effect, that he thought two of the justices of this court, Willoughby and Travis, were against him, and as inconsistent with his additional cause for a new trial that these two judges should not have participated in the decision of his case. His feelings, best known to himself, toward these two justices, and the character of his activities and methods used to defeat them for re-election, might well be regarded as vindictive and the foundation for his belief that they could not give him a fair trial. In order to meet this contingency, and to assure all of the respondents a fair and impartial consideration of their case, the court appointed a committee of six outstanding well and favorably-known members of the bar of Indiana as a committee *amici curiae*, and requested its conclusion upon the case submitted to the court and, upon which showing, respondent had moved for his discharge. Seldom, if at all, did any member of this committee have anything to do with cases involving liquor law violations, and, in the opinion of the court, not one of them had any prejudice for or against either of the respondents. They were church members and acted under their solemn oath taken upon their admission to the bar.

One of the members of this committee, Judge Lairy, while a member of this court, wrote the case (*Zuver* v. *State* [1919], 188 Ind. 60, 121 N. E. 828) expressly relied on by respondent for his discharge. This committee, as will appear from its report on file in this case, gave the questions involved exceedingly careful consideration, with the result that five of the six unanimously agreed that the respondent's acts charged in the information

were contemptuous and that his response was insufficient to purge him of the charge. The other member of the committee, Mr. Shirley, reported that "while I regard his (Shumaker's) conduct in preparing and publishing the alleged report as entirely without justification, and while the publication is absurdly inaccurate in its report of the decisions in question, I do not think that the language used is libelous *per se*, or that it necessarily imputes lack of integrity to the court or any of the judges." His conclusion, as will be observed from reading his report, was based upon the assumption that the publication charged as contemptuous had to do with cases no longer pending in this court in any form. The other members of the committee interpreted the publication of the matters alleged to be contemptuous as applying not only to cases disposed of, but an attempt, in its effect and purpose, to control the decisions of this court in like cases well known to be pending for decision, by falsely representing to the public or to the members of respondent's organization the attitude of the personnel of the court or certain of its members in the decision of intoxicating-liquor appeals.

It will hardly be said that the exhibits filed with the information, and which were widely distributed throughout the State of Indiana, did not evince a purpose to control the decisions of this court in the class of cases generally known as "liquor cases," for the reason, additional to those mentioned in the original opinion, by requiring a pledge, or at least some intimation from a candidate for election to this bench indicating acquiescence with respondent's views that "substantial justice has been defeated repeatedly" in the enforcement of what is known as our Prohibition Law (Acts 1917, ch. 4) if he would obtain the indorsement and active support of the respondent. Each member of the Supreme Court of Indiana, before proceeding with

the duties as such judge, must take an oath to support the Constitution of the United States, the Constitution of the State of Indiana, and to faithfully discharge the duties of his office. The oath is broad and comprehensive. His general fitness for the place is determined, or should be, by those who place him in nomination, and his election should not depend in any respect upon promises made, directly or evasively, of any "advantage" through decision to any person, bloc, or organization. Under such circumstances, the promisor would be more or less consciously advised of the particular influence which assisted in his election, and, to some extent, at least, would embarrass the independence of his judgment, a condition possibly sought to be eradicated by the Corrupt Practices Act (§§7661-7675 Burns 1926).

We find no reason for changing our former ruling on respondent's motion for a new trial.

Gemmill and Martin, JJ., concur in the ruling on the motion of respondent Martin, and in the ruling on relator's motion to modify the judgment and increase sentence of respondent Shumaker, but dissent as to the rulings on the petition for a rehearing and the motion for a new trial of respondent Shumaker and reserve the right to file an opinion within the term.

OPINION OF MARTIN, J., CONCURRING IN PART WITH
SUPPLEMENTAL OPINION AND DISSENTING
IN PART THERETO.

(Filed October 18, 1928.)

On (I) respondent Martin's motion for a new trial and additional response (II) realtor's motion to modify the judgment and increase sentence of respondent Shumaker, and (III) petition for rehearing and motion for a new trial (on the original finding) by respondent Shumaker.

(I) For the reasons pointed out in my dissenting opinion filed at the time the decision herein was rendered,

I concur in the order of the court now entered with respect to respondent Martin by which the finding as to him is vacated.

(II) I also concur in the conclusion reached by the court in denying the Attorney-General's motion to increase the sentence of respondent Shumaker for the following reasons: (A) Because the court had no jurisdiction in this proceeding to try the respondent on the new charge attempted to be set forth in the motion, the motion itself being insufficient and the acts attempted to be alleged therein being clearly not a part of the original offense and not in the nature of a continuing offense but being entirely separate and of a different character. (B) (1) Because the evidence adduced at the hearing was shown to have been presented to the court or to a certain member or members thereof before the judgment was rendered; (2) because the principal items of evidence presented by relator, viz., depositions of Senator James E. Watson and Mr. Henry Lane Wilson, were incompetent and wrongfully admitted; and (3) because the evidence does not show any contempt or "corrupt attempts to influence a decision" as alleged by the Attorney-General.

(A) Relator's "motion to modify judgment and to increase sentence" is as follows:

"Comes now the State of Indiana and moves to modify the judgment rendered against the respondent, Edward S. Shumaker, and to increase the sentence imposed on him on the ground that the same now appears inadequate because of corrupt attempts by him, the said Shumaker, to corruptly influence a decision favorable to him in said cause."

No direct allegation of any fact is made and the motion concludes with a statement that the state "offers the testimony" of certain persons, and a request that a date be fixed for the hearing and that the witnesses be subpoenaed.

Not only are these allegations of conclusions by the pleader entirely insufficient to legally charge any person with an offense or with contempt, but it also appears from the allegations that the "corrupt attempts" referred to are not in the nature of a part of the original offense, or a continuing offense, but are entirely separate and distinct and of a different character from the acts alleged in the original action and upon which respondent has been found guilty and sentenced. That being true, the prosecution for such separate and distinct subsequent alleged contempt could be brought only in a new and separate information. The only element of similarity of the two alleged offenses is that they are both alleged indirect contempts of court. The respondent's punishment for one offense cannot be increased because of his alleged commission of a subsequent separate offense.

Even in cases of direct contempt a respondent is afforded an opportunity for defense, and in cases of indirect contempt the authorities are uniform in holding that they "must be instituted by an accusation or affidavit presented to the court *setting forth the facts constituting the contempt*," 13 C. J. 64, §88, and that, "Since a person accused of contempt committed out of the presence of the court or judge is entitled to be informed of the nature and cause of the accusation against him, the initiatory information or affidavit is jurisdictional . . . all authorities agree that the charging paper must show on its face facts sufficient to constitute a contempt," 13 C. J. 64, 65, §89, notes 81, 85; *Stewart* v. *State* (1894), 140 Ind. 7, 39 N. E. 508; *Whittem* v. *State* (1871), 36 Ind. 196; *Saunderson* v. *State* (1898), 151 Ind. 550, 52 N. E. 151.

A court must have a definite and proper charge upon which to base its judgment, and a respondent is entitled to such an allegation of facts under oath as will enable

him to purge himself thereof by an answer under oath, if, when advised of such facts, he is able to make such answer thereto. Relator's motion alleges no facts from which the court can determine whether or not a contempt has been committed, nor from which the respondent is able to determine the nature or character of the charge against him, and it follows that this court had no jurisdiction to proceed to trial thereunder. I am therefore of the opinion, not only that the motion of the Attorney-General to modify the judgment and to increase the sentence was properly denied, but also that the objections of the respondent Shumaker to further trial and hearing on the motion to modify judgment and to increase sentence should have been sustained.

(B) (1) After judgment herein was rendered on August 5, 1927, a letter from the respondent Shumaker, dated August 6, 1926, to United States Senator James E. Watson, and the senator's reply thereto dated August 8, 1926, were published in the newspapers of September 17, 1927. Soon after these letters were published the Attorney-General filed his motion to modify the judgment and increase the penalty "on the ground that the same *now* appears inadequate," etc.

It developed at the hearing on this motion not only that these letters were the basis for the motion, but also that the original of the Shumaker letter and a carbon copy of the Watson letter from Senator Watson's files were in the possession of the Attorney-General as early as November, 1926, and that at a date later than that, but before judgment, the Attorney-General showed the correspondence to one or more of the members of this court, and that he had divulged the contents of the letters to newspaper reporters. This act of presenting evidence to a member of the court in the absence of the adverse party, should estop the relator from setting up

those facts in the nature of newly-discovered evidence after judgment has been rendered.

(B) (2)  The state, without a waiver on the part of the respondent, cannot lawfully take and introduce depositions in evidence upon the trial of a proceeding for criminal contempt.  The depositions of the two principal witnesses for relator were received over the objection of the respondent, who had not waived his right of confrontation of witnesses.

Proceedings for contempts are of two classes:  (a) Those criminal or punitive in their nature, prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders; and (b) those civil, remedial or coercive in their nature instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for enforcing the rights and administering the remedies to which the court has found them to be entitled.  The government, the courts, and the people are interested in the prosecutions for criminal contempts, while the parties chiefly in interest in the institution of civil contempts are the individuals whose private rights and remedies are sought to be enforced.  *Bessette* v. *W. B. Conkey Co.* (1904), 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997; *Anderson* v. *Indianapolis Drop Forging Co.* (1904), 34 Ind. App. 100, 72 N. E. 277.

While it is generally held that the respondent in inquiries as to criminal contempt is not entitled to a jury trial (but contempts are none the less offenses because trial by jury does not extend to them as a matter of constitutional right, *Gompers* v. *United States, infra*), or to a change of venue (*Dale* v. *State* [1926], 198 Ind. 110, 150 N. E. 781, 49 A. L. R. 647),[1] he is entitled to all

---

[1]In the original majority opinion herein the statement is made that *Dale* v. *State, supra,* "did not decide whether or not the proceeding is criminal and did not decide that the rules of criminal procedure prevail."  In the prevailing supplemental opinion the court cites the

the substantial rights of a person accused of crime that are consistent with the summary nature of proceeding, the case is governed by the analogies of criminal procedure, and the respondent is entitled to the same rules of evidence and presumptions of innocence that avail him in any criminal case. *Gompers* v. *Bucks Stove and Range Co.* (1911), 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; *Gompers* v. *United States* (1914), 233 U. S. 604, 34 Sup. Ct. 693, 58 L. Ed. 1115; *Bates' Case* (1875), 55 N. H. 325; *Kidd* v. *Virginia, etc.* (1912), 113 Va. 612, 75 S. E. 145; *Hotaling* v. *Superior Court* (1923), 191 Cal. 501, 217 Pac. 73, 29 A. L. R. 127; *State* v. *Ralphsnyder* (1890), 34 W. Va. 352, 12 S. E. 721; *Hammond Lumber Co.* v. *Sailors, etc., Union* (1909), 167 Fed. 809. Thus the respondent is not obliged to be a witness against himself, *Ex parte Gould* (1893), 99 Cal. 360, 33 Pac. 1112, 21 L. R. A. 751, 37 Am. St. 57; the rule against conviction on the sole testimony of an accomplice applies, *State* v. *District Court* (1908), 37 Mont. 191, 95 Pac. 593, 15 Ann. Cas. 743; the evidence must be sufficient to establish guilt beyond a reasonable doubt, *Kidd* v. *Virginia, etc., supra;* and the accused must be bodily in court at the time of the sentence, *Welch* v. *Barber* (1884), 52 Conn. 147, 52 Am. Rep. 567; *Ex parte Mylius* (1907), 61 W. Va. 405, 56 S. E. 602, 11 Ann. Cas. 812, 10 L. R. A. (N. S.) 1098, and note; and thus it uniformly has been held that orders inflicting punishment for criminal contempt of court, as distinguished from civil or remedial contempt are within the range of the pardoning power vested in the executive because such punishment is for a public

---

Dale case as authority for its statement, "while this proceeding may be classed as one for criminal contempt, yet by no means is it a criminal action in the sense that the rules for the admission of evidence in a criminal case apply," but the decision in that case goes no further in this regard than indicated in the text.

offense, the whole doctrine of contempt going to the point that the offense is a wrong to the public, not to the person of the functionary to whom it is offered considered merely as an individual. *Ex parte Grossman* (1925), 267 U. S. 87, 45 Sup. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131; *State* v. *Magee* (1924), 29 N. M. 455, 224 Pac. 1028, 38 A. L. R. 142; *State, ex rel.,* v. *Sauvinet* (1872), 24 La. Ann. 119, 13 Am. Rep. 115; *Sharp* v. *State* (1899), 102 Tenn. 9, 49 S. W. 752, 73 Am. St. 851, 43 L. R. A. 788; *Ex parte Hickey* (1844), 12 Miss. 751; notes, 23 A. L. R. 584, 38 A. L. R. 171.

Speaking of criminal contempts of court, Justice Holmes for the United States Supreme Court in *Gompers* v. *United States, supra,* said:

"These contempts are infractions of the law visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristics of crimes as that word has been understood in English speech."[1]

---

[1] The distinction between civil and criminal contempts is sometimes difficult to point out, *Smith* v. *Clothier* (1923), 113 Kans. 47, 213 Pac. 1071; the holdings of the courts are not uniform in distinguishing between them, see *Hammond Lumber Co.* v. *Sailors, etc., Union, supra;* and sometimes a civil contempt may also constitute a criminal contempt, *Elec. Bleaching Gas. Co.* v. *Paradon Eng. Co.* (1926), 15 Fed. (2d) 854; *Bessette* v. *Conkey, supra.* Thus proceedings for contempt criminal in their nature may arise in civil actions, *Hammond Lumber Co.* v. *Sailors, etc., Union, supra; Garrigan* v. *United States* (1908), 163 Fed. 16, 89 C. C. A. 494, 23 L. R. A. (N. S.) 1295; *Gompers* v. *Bucks Stove and Range Co., supra.* All courts seem to be agreed that in cases of criminal contempt the proceedings should conform as nearly as possible to proceedings in criminal cases. In *Gompers* v. *Bucks Stove and Range Co., supra,* it was held that punishment by imprisonment may be remedial, as well as punitive, that imprisonment in civil contempt is not inflicted as a punishment but as a coercive remedy, i. e., that the respondent stand committed unless and until he performs the affirmative act required by the court's order; and that imprisonment for doing an act forbidden punished by imprisonment for a definite term is a punitive remedy for criminal contempt. Some cases hold that regardless of whether the contempt is civil or criminal, if a conviction might subject the defendant to imprisonment, he should not be tried on *ex parte* affidavits, *New Jersey Pat. Co.* v. *Martin* (1909), 166 Fed. 1010; and Corpus Juris draws the conclusion that as a general rule the evidence admissible should be only such as would be admissible on the trial of an indictment for the same offense in cases of contempt not committed in the presence of the court, 13 C. J. 76.

Criminal contempt proceedings in Indiana have always been governed by criminal procedure. *Whittem* v. *State, supra,* at p. 204; *Wilson* v. *State* (1877), 57 Ind. 71. In the Whittem case the court said:

"A proceeding for contempt is in the nature of a criminal prosecution. The results and consequences are the same in the one proceeding as in the other. In both the party convicted may be deprived of his liberty and confined in jail and subjected to the payment of a fine," and in the Wilson case said:
"This being a proceeding to punish the appellant for a constructive contempt and being in the nature of a criminal proceeding . . . an affidavit ought to have been filed against the appellant before the attachment was issued."

The only citation given in the supplemental opinion of the majority of the court as authority for holding that in such a proceeding "evidence in the form of depositions of witnesses residing in foreign jurisdictions is not objectional" is *Una* v. *Dodd* (1884), 38 N. J. Eq. 460. This was an opinion written by a vice-chancellor in a court of chancery advising an order to take testimony of a non-resident witness. The president of a savings bank was held guilty of contempt for the alleged violation of an order of the chancellor regarding the investment of moneys in certain securities, (*Una* v. *Dodd* [1884], 39 N. J. Eq. 173), but upon appeal to the court of error and appeals, that court, in reversing the judgment of the chancery court, expressly held that the alleged contempt was not a proceeding "(1) to punish contemptuous conduct in the presence of, or with respect to the authority or dignity of the court" but was "(2) as a method of affording relief *inter partes*" *Dodd* v. *Una* (1885), 40 N. J. Eq. 672, 5 Atl. 155.[1]

---

[1]The court said: "The first is a proceeding of a criminal nature . . . punishable by imprisonment until the contempt be purged, or by a fine payable to the state. The second is set on foot at the instance

The court of errors and appeals of New Jersey holds, as do the courts generally as above noted, that in cases of criminal or punitive contempt the defendant is entitled to all of the substantial rights of a person accused of crime that are consistent with the summary nature of the proceeding, *Staley* v. *South Jersey Realty Co.* (1914), 83 N. J. Eq. 300, 90 Atl. 1042, Ann. Cas. 1916B 955.[1]

It follows that the depositions of Senator Watson and Mr. Wilson taken without a waiver by the respondent and introduced over his objection were erroneously admitted in evidence.

(B) (3)   The prevailing supplemental opinion states that "notwithstanding the inference which might be drawn from his (Shumaker's) various activities we are not disposed . . . to modify the judgment," and increase the sentence.   If the inference can reasonably and justly be drawn from the evidence (conceding for argument its admissibility) that Shumaker threatened to defeat, at the 1926 election, a certain judge of the court unless this case was decided in his favor, then

---

of the parties aggrieved.   Such a proceeding is remedial in nature, and the relief afforded is by imprisonment until the party adjudged in contempt does justice to his adversary.

" . . . The proceeding was treated by the parties and the court as one in the interest of the petitioners . . . prosecuted in their behalf and under their control, and not as a proceeding initiated by the court to preserve its own dignity and power, and to punish those who had insulted the one or defiled the other.   The issue was made up not from formal interrogatories and answers under an attachment but from the respective allegations of the petition and answers."

[1]There the court, after determining that the contempt involved was criminal, and not civil, said:   "If . . . the affront is to be punished by the tribunal at which it was aimed, and which by its constitution is both judge and jury and accuser as well, it is all the more important that there should be a scrupulous observance of the substantial rights of the defendant . . . among these· . . . is that the defendant's guilt must be proved by judicial evidence, *i. e.*, by testimony to which the ordinary rules of evidence are applied which is not the case with *ex parte* affidavits. . . . These . . . were not legal evidence in a proceeding at law such as this. . . . The person at whom the criminal proceeding is directed is entitled throughout to such of the substantial rights of a person accused of crime as are consistent with the summary nature of the proceeding and the processes of the forum in which it is administered."

punishment should in a proper proceeding be meted out to him for such contempt. I do not believe such inference can reasonably be drawn from the evidence before the court, and by refusing to modify the judgment as requested by the Attorney-General it seems clear that the majority of the court did not draw that inference.

It appears that respondent sought, in August, 1926, to obtain a prompt decision of his case (which is still pending). That was his right under our Constitution. §12, Art. 1, Constitution, §64 Burns 1926. It is also clear that he thought a decision at that time would be more likely to be favorable to him than a deferred decision, but from that fact it does not follow that his effort to obtain a decision speedily and without delay was an attempt to corruptly influence a decision in his favor.

An attempt to influence what the decision of a court shall be, except by open and proper argument to the court in the manner provided by the rules, may constitute contempt, but an attempt merely to get a case decided promptly is within every litigant's rights. Particularly is this true if the litigant believes that his case is being held up for political reasons to his disadvantage.

The evidence adduced at the hearing consisted of the correspondence above referred to between the respondent Shumaker, and Senator James E. Watson; of a long distance telephone conversation between Shumaker and Watson, one end of which was overheard by Senator Arthur R. Robinson and the other end by Henry Lane Wilson, late of the United States diplomatic service (the testimony of Watson and Wilson being given by depositions) and of a conversation by the respondent Shumaker with the then Republican State Chairman. The Attorney-General and a Methodist minister also testified.

In Shumaker's letter to Watson he said in part:

"As I said to you over the phone last night I am entitled to a speedy determination of the criminal case that the Attorney General of Indiana has brought against me in the Supreme Court. . . . This looks to me like a case of politics. . . . I think I am entitled to know one of two things immediately: either the decision of the court, or plain unequivocal statement from yourself and the Republican organization that you are not in sympathy with Gilliom's movement. . . ."

The testimony directly dealing with the question whether or not respondent sought to "corruptly influence a decision favorable to him in said cause" is as follows: Clyde A. Walb, the Republican State Chairman testified in answer to the question, "Now did he in that conversation say to you either directly or indirectly that he wanted you personally or otherwise to try to influence any of the judges of the supreme court?" as follows: "No. I was to influence Arthur Gilliom. . . . I understood that if I would be able to convince the Attorney-General it would help his own situation and help politically otherwise." Senator Watson, in response to a question as to whether Shumaker had asked him to use his influence and have the Supreme Court meet during the recess and acquit him, testified as follows:

"General, I have been cudgelling my brain on that proposition. As far as I am willing to go in a statement is this: He said: 'You ought to use your influence to have this court brought together at once and not permit this thing to run over until after election, and when they come together, of course, I want this court to find in my behalf.'"

He testified that he did not speak to any of the judges of the Supreme Court concerning the case and detailed a conversation he had with Senator Robinson as follows:

"Senator Robinson came into my room one morning and asked me what I thought about the Shumaker case. 'Well,' I said, 'Arthur, I have paid very little attention to it and I know but little regarding it.' He said 'Well I do not think Shumaker ought to be sent to jail for what he is charged with having said about the courts,' and I said 'I don't, from what I know of it.' He said 'Well, what can be done, do you think, in a legitimate way to help·him?' I said 'I cannot talk to any member of the court about it and neither can you, but I am willing to do what I can indirectly to influence Arthur Gilliom and see if he would be satisfied with some lesser punishment.' He said, 'Well I wish you would.' "

Explaining an excerpt from his letter to Shumaker which was as follows: "I wrote a number of letters through Indiana that I hoped might be helpful in bringing about such a conclusion"—and stating what he did in that regard, he said:

"As far as I now recall, Géneral Gilliom. I wrote two letters to Indiana to men who are very strong personal friends of yours—I am not going to mention their names—in which I asked them to see whether or not you would . . . not be satisfied to permit, as far as you controlled the decision, the Supreme Court to fine and reprimand Shumaker for contempt—I said I thought the ends of justice would be subserved and the dignity of the court upheld if that sort of a decision could be reached."

He testified further regarding this as follows:

Q. "Now I want to ask you this: Did you write those letters at the request of Shumaker?" A. "No I did not. . . ."

Senator Robinson testified that never at any time did Dr. Shumaker in any form directly or indirectly request him to use his influence with this court or any of its members in any manner concerning this case and that he had never tried to influence the Attorney-General

nor attempted in the slightest degree, one way or the other, to influence the deliberations of this court.

The Rev. G. F. Hulbard of Auburn, Indiana, formerly the pastor of the church of which Mr. Walb was a member, told of writing a letter to Mr. Walb, but, upon his testimony that respondent Shumaker knew nothing about the letter and had not inspired its writing, an objection was sustained to its introduction in evidence.

The only other witnesses examined in addition to the respondent were the relator and Henry Lane Wilson (by deposition) neither of whom so far as the evidence shows ever talked with the respondent.

It thus appears that if there was any effort to influence anybody to do anything except to expedite the decision of the case, that person was the Attorney-General and not the court or any of its members, as alleged.

III.   The principal questions raised by respondent Shumaker's petition for rehearing and motion for a new trial were not considered in the supplemental opinion but considerable space therein was devoted to a discussion of the fact that a report by a committee *amici curiae* was adverse to respondent, and of what the court believes to be an inconsistency in respondent's insistence: (1)   that the appointment of a committee to act as *amici curiae* was harmful to him, and (2) that two members of the court were against him and should not have participated in the decision of his case.   The responsibility for the decision rests, not upon the majority of the committee *amici curiae*, but upon the three members of the court constituting a majority thereof.   The report made by the committee differed from a brief filed by any *amicus curiae* only in that it was prepared at the request of the court rather than voluntarily with the consent of the court.   No charge is made that any of the eminent gentlemen who served on the committee did not act conscientiously or in good faith, but in view

of the fact that the committee was appointed without any participation by the respondent or his counsel in the selection of its personnel, and was appointed by the court, including the two members referred to, I do not perceive any inconsistency in respondent's contentions.

The supplemental opinion has well stated the nature of the oath of office of the members of this court, and the necessity for judicial independence. But there is nothing in the record to bear out the statement that:

> "The exhibits filed with the information . . . evince a purpose to control the decisions of the court . . . for the reason additional to those mentioned in the original opinion, *by requiring a pledge or at least some intimation from a candidate for election to this bench indicating acquiescence with respondent's views,*" etc.

There was no evidence that respondent or his organization ever requested pledges or statements from any candidate for any judicial office and with the record of judicial candidates an open book the requiring of an "intimation" would be as useless as it would be improper. Certainly this court would not undertake to say that respondent or any other voter of the State of Indiana could not publicly oppose a candidate for judicial office with whose views he disagrees.

Discussion herein of the points made in my original dissenting opinion, which remain unanswered, would be useless. The majority opinion in this case has been the subject of many critical reviews. 26 Michigan Law Review 440; 41 Harvard Law Review 254; 76 Pennsylvania Law Review 210; 6 Texas Law Review 388; 3 Indiana Law Journal 149, 732; 22 Illinois Law Review 768; 2 St. John's Law Review 88.*

---

*In this connection see, also, the recent History of Contempt of Court (1927) by Sir John Fox, and the numerous reviews thereof in current periodicals including 28 Columbia Law Review 401.

The decision in this case and the sentencing of the respondent Shumaker to imprisonment resulted in widespread discussion and comment in the press and in public meetings, and the criticism and condemnation of this judgment by newspaper editorials, speakers on the platform and ministers in their pulpits was far more severe than was the respondent's criticism which brought about the judgment, as is shown by the following illustrative quotations:

"The decision is the product of selfishness and partisan influence." Resolution, Northwest Indiana M. E. Conference at Lafayette, August 8, 1928.

"Most of the church congregations (in Anderson) stood as a unit when asked to stand if they were opposed to the penalty imposed by the court." Indianapolis News, August 8, 1927.

"The decision . . . is a blow to the fundamental right of free speech. . . . The sentence vindictive. . . . 'If Dr. Shumaker is guilty of contempt then so am I, so is Bishop Fout, so is Bishop Leete and every other member of the board of trustees.'"— Rev. Geo. S. Henninger, Tenth Street M. E. Church, Indianapolis Post, August 8, 1927.

"The majority of the people of the state will support him in his efforts to have the verdict set aside."—Indianapolis Post, August 8, 1927.

"Mr. Shumaker's sentence is not only in contravention of good sense but it should be in contravention of the law of the commonwealth, and that not because it is Mr. Shumaker, who is the victim, but because it is a citizen that is the victim."—Muncie Press, August 8, 1927.

"We believe that the supreme court is altogether in the wrong and that its decision is a very dangerous attack on the rights and liberties of the citizen. . . . This ruling of our supreme court ought not to be allowed to become a precedent. Nor do we

believe it will be.    Some day it will be repudiated."
—Indianapolis News, August 8, 1927.

"It must not stand. . . . If this power goes un-
challenged, another stone has been dynamited from
the Rock of Ages upon which this nation is built.
There should be more than protest.    If it be neces-
sary to write the plainer language the guarantee of
free speech, protecting even from the highest court,
that should be done. . . . The people should con-
sider what this decision does to them, not to Shu-
maker. . . . The people of the State of Indiana
should at once consider plans for a state convention
that will amend a document (the Constitution)
that gives the states supreme court the power of an
oligarchy." Indianapolis Times, August 11, 1927.

"The opinion of the Indiana Supreme Court hold-
ing E. S. Shumaker guilty of contempt of court is a
challenge to Hoosier citizenship.    It is a direct as-
sault on the right of free speech.    It denies to
Hoosier citizens the most sacred right vouchsafed
to them in both the Federal and State Constitutions.
. . . We hold no brief for Ed. Shumaker. . . .
We do not like his methods. . . . His power in this
state needs to be curbed.    But he was not in con-
tempt of court. . . .  We frankly criticize this
opinion. . . . It is a travesty on Indiana's sense of
democracy and common justice." Lebanon Re-
porter, August, 1927.

"The supreme court has created a question that
is too big to be fogged or clouded by the personality
of Shumaker. . . . It is a question of whether the
supreme court has power to shackle discussion of its
decisions. . . . Is it worth while to throw away
the rest of the Bill of Rights in order to stop this one
man?    The remedy against falsehood is truth.    The
cure for intolerance has never been found. . . .
The place to curb Shumaker . . . is not in a su-
preme court but at the ballot box." Indianapolis
Times, August 8, 1927.

The court, by allowing to go unchallenged and un-

questioned the many hundreds of persons (persons who were hostile as well as persons who were friendly to respondent Shumaker) who have thus in no uncertain terms condemned the decision of the court in the case at bar, has either admitted that such comment is not in contempt of court or has admitted the futility of attempting to control by means of contempt proceedings the expression of public opinion.

Gemmill, J., concurs in this opinion.